**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| IN RE: | * | CASE NO:  13-33232 |
| | * | (Chapter 11) |
| LITEFLEX, LLC | * | (Judge Lawrence S. Walter) |
| | * | |
| Debtor-in-Possession. | * | |

**DECLARATION OF JOHN PRIKKEL III IN SUPPORT OF
FIRST-DAY MOTIONS AND APPLICATIONS**

I, John Prikkel III, hereby declare:

1.     I am President and sole member of the Debtor, Liteflex, LLC, referred to herein as "Liteflex", the "Company", or the "Debtor."  I am familiar with the day-today operations, business affairs, books and records of the Debtor.


2.     I submit this Declaration in connection with the voluntary Chapter 11 petition, first-day motions and applications of the Debtor in the above-captioned Chapter 11 case.  All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by others at the Company, upon information supplied to me by counsel to the Debtor, upon my review of relevant documents, or upon my opinion based on my experience and knowledge with respect to the Debtor's operations, financial condition and related business issues.   If I were called upon to testify, I could and would testify competently to the facts set forth herein, and am authorized to submit this Declaration on behalf of the Debtor.

3.      Part I of this Declaration describes the business of the Debtor and the relevant background preceding the filing of this Chapter 11 petition.  Part II of this Declaration sets forth the relevant facts in support of each first-day motion and application filed by the Debtor concurrently herewith.  I am familiar with the first-day motions and applications filed by the Debtor.

## I.  BACKGROUND

### A.  The Chapter 11 Filing.

4.      On the date hereof, the Debtor commenced this case by the filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Commencement Date").[1] Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is operating its business and managing its affairs as Debtor in Possession.  As of the date hereof, no creditor's committee, trustee or examiner has been appointed in this Chapter 11 case.

### Overview

5.      Liteflex, LLC is an Ohio Limited Liability Company headquartered in Englewood, Ohio, owned solely by me, which manufactures composite leaf springs for the

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to that term in the respective first-day Motion or Application.

passenger vehicle market, as well as for the light-duty and heavy-duty commercial vehicle markets. Liteflex primarily sells its product directly to original equipment manufacturers both domestically and abroad, though it has several aftermarket customers as well. Liteflex and its predecessor in interest have been manufacturing composite springs for thirty (30) years which are in use on over 15 million vehicles worldwide, including General Motors, Ford, Range Rover, DaimlerChrysler, Iveco, Kenworth, Peterbilt, Freightliner and Navistar, among others. Liteflex spring materials have the unique characteristic of being extremely lightweight and will not rust or lose strength with age or use. Liteflex materials also have high elastic strain properties which make them ideal for use as a spring.

6.      Liteflex believes a successful reorganization will allow it to expand its customer base and continue serving its current customers with quality products.

**History and Corporate Structure**

7.      In 2000, I entered into an agreement to purchase certain assets (the "Asset Purchase") from Delphi Automotive PLC, which is a leading global supplier of automotive and truck parts. The Asset Purchase consisted of certain customer lists, inventories, and equipment related to the manufacture of automotive and truck parts, which I believed would provide a profitable business opportunity. My intention was to use the Asset Purchase to start a business which would produce composite leaf springs for the automotive and trucking industry. However, the Asset Purchase was not a "turn-key" purchase in that it alone did not include the technology

and know-how needed to operate a profitable stand-alone composite leaf spring manufacturing business.

8.    Thus, I brokered a separate agreement (the "NCC License Agreement") with National Composite Center ("NCC") to license the technology and know-how needed to turn the Asset Purchase into a successful and profitable composite leaf spring manufacturing business.

9.    I formed Liteflex, LLC in 2001 to operate a business related to the Asset Purchase and NCC License Agreement. Since that time, Liteflex has enjoyed continued success and expansion, mainly in business of manufacturing and selling leaf springs for automobiles and trucks produced with composite materials.

10.    I am the sole owner of Liteflex and its President. I hold a Masters Degree of Science in the field of engineering and am a licensed Professional Engineer. I have fifty (50) years of experience as an engineer, inventor, and manager and owner of various other companies, and currently hold fourteen (14) patents, with three additional patents pending. In my role as President of Liteflex, I am in charge of managing Liteflex, making all final business decisions, and identifying business opportunities. Because of my engineering and business background, I am able to identify opportunities that others may miss. I am also involved in the day to day operations of Liteflex as it relates to the engineering aspects of designing, producing, manufacturing, and improvement of our products.

11.     The Liteflex production process (the "Production Process") can be broken down into two major components, consisting first of the manufacturing process (the "Manufacturing Process"), and secondly the finishing process (the "Finishing Process"). The Manufacturing Process is the first step of the Production Process, and consists of molding springs from raw materials, cutting them to the proper size, drilling holes in the proper locations, and general clean up. The Finishing Process is the second step of the Production Process, and consists of painting, drilling finishing holes, attaching components, coating, packaging, and shipping to customers. The Manufacturing Process is performed directly by Liteflex. The Finishing Process is completed by a third party company under contract with Liteflex, Brandt Manufacturing, LLC ("Brandt Manufacturing"), which is owned solely by me. Though the Finishing Process is contracted to Brandt Manufacturing, all components of the Finishing Process are supervised directly by Liteflex, and Liteflex is involved in the entire Production Process from start to finish.

12.     The Manufacturing Process is completed by Liteflex at facilities located at 915 Valley Street, Dayton, OH 45404 (the "Manufacturing Facility"). The Manufacturing Facility is owned by JPI, Inc. which is owned solely by me. The Manufacturing Facility is the subject of a lease agreement between Liteflex and JPI (the "Manufacturing Facility Lease").

13.     The Finishing Process is completed by Brandt Manufacturing at facilities located at 100 Holiday Drive, Englewood, OH 45322 (the "Finishing Facility"). The Finishing Facility is owned solely by me. The Finishing Facility is the subject of a lease agreement between Liteflex and me (the "Finishing Facility Lease"). The Finishing Facility also serves as operational and administrative headquarters to both Liteflex and Brandt Manufacturing.

14.     Liteflex also leases property from Maywood Real Estate, LLC, which owns the

real estate located at 2600 Maywood Ave, Dayton, OH 45417 ("Building 29"). Liteflex leases

Building 29 for storage purposes. Maywood Real Estate, LLC is owned solely by me.

15.     Liteflex also leases the real estate located at 850 Patterson Road Dayton, OH

45419 ("Patterson Building") which is owned solely by me. Liteflex leases the Patterson

Building for storage purposes.

**Secured Creditor**

16.     On or about December 15, 2010, the Debtor entered into a credit agreement (the

"Credit Agreement") with Fifth Third Bank (the "Secured Lender"), consisting of two

components. The first component of the Credit Agreement is a Term Note in the original

principal amount of $600,000.00 (the "Term Note"). As of the Petition Date, the balance on the

Term Note was $280,000.00. The second component of the Credit Agreement is a Line of Credit

Facility under which the Secured Lender made loans to the Company at the Company's request

from time to time up to a maximum of $1,000,000.00 (the "Revolving Note").  As of the Petition

Date, the principal balance on the Revolving Note was $783,000.00. The Revolving Note is an

asset-based loan facility, and Liteflex provides the Secured Lender with borrowing base

certificates as required by the Credit Agreement.

17.    On or about April 1, 2013, the Debtor entered into a separate credit agreement
with Secured Lender, which was guaranteed by the Export-Import Bank of the United States
Working Capital Guarantee Program under which the Secured Lender made loans to Debtor at
Debtor's request from time to time up to a maximum of $1,000,000.00 (the "Revolving EX-IM
Note"). As of the Petition Date, there was a zero balance on the Revolving EX-IM Note. The
Revolving EX-IM Note is also an asset based facility, based upon non-U.S. accounts receivable,
but I have been informed that there is no availability on the Revolving EX-IM Note at this time.

18.    In conjunction with the Credit Agreement, Term Note, and Revolving Note, the
Debtor executed a security agreement in favor of the Secured Lender pledging all of its personal
property assets as collateral (the "Collateral") for said loans and any additional loans[2]. It is my
understanding that the Secured Lender made filings to the Ohio Secretary of State in this regard
as well.

19.    All payments to Secured Lender related to the Term Loan, Revolving Note, and
Revolving EX-IM Note were current on the Petition Date. The Term Note, Revolving Note, and
Revolving EX-IM Note may be referred to herein collectively as "the Loans".

20.    Debtor intends to continue use of the Revolving Note as a line of credit, as more
fully described herein and in the Motion for Authority to Obtain Debtor-in-Possession Financing.

---

[2] The Revolving EX-IM Note is also subject to the Security Agreement pursuant to its terms.

**Insurance**

21.    In connection with the operation of its business and management, the Debtor maintains numerous insurance policies (collectively, the "Insurance Policies").  The Insurance Policies include coverage for, among other things commercial general liability, property, auto liability, workers' compensation, employers' liability, directors' and officers' liability, fiduciary liability, umbrella liability coverage, and other miscellaneous coverage.  I believe the third-party claims that are covered by the Insurance Policies are neither unusual in amount nor in number in relation to the extent of the business operations conducted by the Debtor.

22.    The Insurance Policies are provided by Admiral Insurance Company, The Cincinnati Insurance Company, and Zurich American Insurance Company.

23.    All Insurance Policies are paid in advance of the applicable coverage period. As of the Commencement Date, I do not believe the Debtor owes any prepetition premiums on the Insurance Policies.

24.    As described herein, continuation of the insurance coverage and insurance policies is essential to the ongoing operations of the Debtor's business.  Accordingly, the Debtor intends to maintain appropriate levels of insurance with respect to the aforementioned categories of insurance policies at all times.

**Events Leading to Decision to file Chapter 11**

25.      I have had a long-standing interest in entering into the military defense business, specifically, developing superior body armor using composite materials for our servicemen and women, to enhance their safety and effectiveness in carrying out their mission of serving and protecting the United States of America. After several years of evaluating various methods of construction, it became clear that if Liteflex were to obtain any military business in the area of body armor, that Liteflex must have a source of boron carbide ceramics. I personally funded an extensive amount of research into this endeavor but had little success in finding a way to develop body armor using boron carbide ceramic materials. In an attempt to find a way to make the process work, I considered using a pressure-less sintering technique, and had extensive research performed in that area. However, after several years of research and investment, I was told ultimately by several scientists it simply would not be possible.

26.      Through a completely unrelated matter in 2008, I happened to meet representatives of RAFAEL Advanced Defense Systems, Ltd., ("RAFAEL"), a military defense company headquartered in Israel. This led to discussions between RAFAEL and Liteflex regarding the development of body armor using boron carbide ceramic materials, and a presentation regarding the same by RAFAEL. RAFAEL asserted that it had the technology to create a superior body armor product using boron carbide ceramic materials, and RAFAEL presented Liteflex with an opportunity to become involved with the manufacturing process.  I was extremely surprised by this since the years of research I personally funded on this subject and the scientists involved in said research concluded this was not possible. When I enquired

regarding the conflict between RAFAEL's claims and my own research on the subject, I was told

by RAFAEL representatives that RAFAEL had discovered a "secret ingredient" which made a

pressure-less sintering technique possible. However, RAFAEL refused to disclose that ingredient

until or unless I entered into a license agreement with their company.

27.     After a long series of negotiations and meetings, RAFAEL and Liteflex

eventually entered into a license agreement on or about July 23, 2009 regarding the manufacture

by Liteflex of body armor for RAFAEL using boron carbide composite material and the

RAFAEL pressure-less sintering technique (the "License Agreement"). However, as the

relationship continued, it became clear to Liteflex that RAFAEL made a number of substantial

misrepresentations in the pre-contractual phase which induced Liteflex to agree to the terms of

the License Agreement, including but not limited to the assertion regarding a "secret ingredient"

as described above. These misrepresentations induced Liteflex to believe that RAFAEL

possessed a unique pressure-less sintering technique that would give Liteflex an advantage over

its competition. However, it did not become clear to Liteflex that RAFAEL had made said

misrepresentations until on or about January 25, 2010. Despite this, Liteflex continued to work

with RAFAEL in an attempt to salvage the project, but it was unable to do so. Accordingly, both

Liteflex and RAFAEL exercised their respective termination rights under the License

Agreement. Both Liteflex and RAFAEL dispute the validity of the other party's termination.

RAFAEL subsequently filed a Request for Arbitration in Germany, based on its assertion that an

arbitration clause contained in the License Agreement was valid and applicable under the

particular circumstances (the "Arbitration Action"). In addition to other relief, RAFAEL

requested damages in the preliminary amount of $4,117,533.00 and a cease and desist order, all

of which Liteflex believes are without merit. Liteflex subsequently filed its Answer requesting, among other things, the rejection of the claims asserted by RAFAEL as a whole and requesting a finding that RAFAEL pay the costs of the arbitration. Liteflex also submitted a counterclaim in the Arbitration Action on November 12, 2012, requesting, among other relief, an order that RAFAEL pay Liteflex $3,261,093.26 in damages related to the License Agreement and RAFAEL's misrepresentations related thereto. Though the parties have engaged in settlement efforts through the Arbitration Action, it is now the strong belief of Liteflex that the parties will not be able to reach terms which are mutually agreeable. The Arbitration Action was still pending on the Commencement Date.

**Decisions to file for Chapter 11 Protection**

28.     While Liteflex continues to operate as a profitable business with positive cash flow, the Arbitration Action and related expenses have been a very heavy burden in terms of cost and time on both Liteflex and its staff. Though Liteflex has been attempting to negotiate a settlement in the Arbitration Action with RAFAEL, the parties have been unable to come to terms which are agreeable to both parties. Liteflex now believes that it will be unable to reach settlement terms with RAFAEL, and as a result, Liteflex expects the matter to be scheduled for a full evidentiary hearing. After much discussion with counsel, its advisors, and management, Liteflex came to the decision that the additional legal fees, costs, time commitment, and other factors associated with continuing the Arbitration Action will simply continue to become more and more burdensome upon Liteflex, and that Chapter 11 bankruptcy protection will allow Liteflex the opportunity to reorganize.

## II. FIRST-DAY MOTIONS

29.      Contemporaneously with the commencement of this Chapter 11 case and the filing of this Declaration, the Debtor has requested various types of relief in "first-day" motions and applications (collectively, the "First Day Motions") in order to minimize the adverse effects of the commencement of this Chapter 11 case on its business. I believe that a critical and necessary element in successfully administering this Chapter 11 case is the approval of the Debtor's First Day Motions submitted concurrently herewith. The factual background and support for each respective First Day Motion is set forth below.

## 1)  Motion of the Debtor and Debtor in Possession for an Order (A) Scheduling Expedited Hearings on Certain First Day Motions and (B) Approving Form and Manner of Notice Thereof

30.      By the above referenced motion (the "Expedited Hearing Motion"), the Debtor seeks entry of an order (A) scheduling an expedited hearing on certain first day motions and (B) approving the form and manner of notice of the expedited hearing.

31.      I believe that the First Day Motions involve matters that require emergency and expedited hearings. As described in detail in each of the First Day Motions, the relief requested is essential to maintain the Debtor's operations and business throughout this Chapter 11 case, as well as to administer this case in an efficient manner. It is my understanding that the

First Day Motions are of the type heard on an emergency or expedited basis, and any delay in authorizing the relief therein could have a severe and irreparable effect on the Debtor's operations and its transition into Chapter 11.

32.     Although the Debtor seeks the scheduling of a hearing on the First Day Motions on the Commencement Date or within one (1) business day thereof, and therefore without notice, I am advised by Counsel that prior to or immediately upon the filing of its Chapter 11 petition the Debtor provided electronic or hard copies of the First Day Motions to (i) The Office of the United States Trustee, 170 North High Street, Suite 200, Columbus, Ohio 43215, Attn: Mary Anne Wilsbacher; (ii) The Twenty Largest Unsecured Creditors, (iii) Patricia L. Hill, counsel for Secured Lender Fifth Third Bank, 1 South Main Street, Suite 900 Dayton, OH 45402, plhill@statmanharris.com, and (iv) Fifth Third Bank, 38 Fountain Square Plaza, Cincinnati, OH 45263.

33.     Accordingly, I believe an expedited hearing on the First Day Motions is warranted in this Chapter 11 case and further believe the form and manner of notice is appropriate as detailed in the Expedited Hearing Motion and the appropriate relief should be granted.

**2) Emergency Motion by Debtor/Debtor-in-Possession For an Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection Payment**

34.     By the above referenced motion (the "Cash Collateral Motion"), the Debtor seeks entry of interim and final orders authorizing the use of Secured Lender's cash collateral and provide adequate protection payments.

35.     As stated herein, Debtor believes, and the Secured Lender asserts that it holds first priority security interests and liens on the Collateral as more particularly described in the Proposed Agreed Interim Order Authorizing Use of Cash Collateral by Debtor/Debtor-in-Possession and Providing Adequate Protection to Fifth Third Bank (the "Agreed Interim Order") appended as Exhibit "G" to the Cash Collateral Motion. Debtor desires to use cash collateral as defined in Section 363(a) of the United States Bankruptcy Code (the "Cash Collateral"), and the Secured Lender is willing to allow Debtor to use such Cash Collateral in accordance with the terms of the proposed Agreed Interim Order.

36.     I have been advised by Counsel that Debtor may not continue to operate its business; to purchase inventory and supplies; and to pay employees, utilities, insurance and expenses needed in its business, without having an order allowing the use of Cash Collateral.

37.     The Debtor requires the immediate use of Cash Collateral to pay present operating expenses, including payroll, and to pay vendors to ensure a continued supply of raw material essential to the Debtor's continued viability. Thus, the use of the Cash Collateral is necessary to avoid immediate and irreparable damage to the Debtor's estate. It is my understanding that the Secured Lender has consented to the use of Cash Collateral by way of an Agreed Interim Order.

**3) Motion for Authority to Secure Debtor-in-Possession Financing**

38.     Pursuant to the above-referenced motion (the "Financing Motion"), the Debtor

seeks entry of an order authorizing it to obtain Debtor-in-Possession ("DIP") Financing.

39.     As previously stated herein, the Debtor is currently party to two lines of credit

with Secured Lender, the Revolving Note and the Revolving EX-IM Note (collectively, the

"Lines of Credit"). The Debtor has determined, in the exercise of its best and reasonable business

judgment, that the ability to draw upon the Lines of Credit post petition addresses the Debtor's

immediate necessary financing needs while it restructures its business.  The financing available

under the Lines of Credit will enable  the Debtor,  among  other  things,  to  avoid  the  cessation

of  its  operations, maintain  the continuity of  its operations pending a conclusion  to  the

bankruptcy  process, and maximize  the value of its business as a going concern.

40.     Unless the Debtor is able to continue to draw upon the Lines of Credit, the

Debtor will not have sufficient available sources of working capital to operate its business in the

ordinary course of business after the Commencement Date.  The Debtor's ability to maintain

business  relationships  with  vendors,  suppliers,  and  customers,  to  pay  its  employees,  and

to otherwise fund its operations, is essential to the Debtor's continued viability and preservation

and maintenance of the going concern value of the Debtor's business.

41.     Given the Debtor's current financial status, the Debtor is unable to obtain credit

that is unsecured.   Accordingly,  after  appropriate  investigation  and  analysis,  the  Debtor's

management has concluded that continued access to the Lines of Credit is the best alternative available under the circumstances. Counsel has informed me that Bankruptcy Courts routinely defer to the Debtor's business judgment on most business decisions, including the decision to borrow money. I further believe that after the Commencement Date, the Debtor will be able to come to terms with the Secured Lender to re-open the Revolving EX-IM loan/line of credit.

42.     Accordingly, I respectfully request the Debtor be granted authority to continue access to the Lines of Credit as more fully described in the Financing Motion.

**4) Motion Of The Debtor And Debtor-In-Possession For An Order (I) Authorizing, But Not Directing, The Debtor To (A) Pay Certain Prepetition Wages, Salaries, Bonuses And Other Compensation; (B) Continue Employee Benefit Programs In The Ordinary Course Of Business; And (C) Pay Certain Reimbursable Expenses; (II) Authorizing, But Not Directing, The Debtor To Make Deductions From Employee Paychecks; And (III) Authorizing And Directing Banks And Other Financial Institutions To Pay All Checks And Electronic Payment Requests Made By The Debtor Relating To The Foregoing**

43.     By the above-referenced motion (the "Employee Wages and Benefits Motion"), the Debtor seeks entry of an order (I) authorizing but not directing, the Debtor to pay (a) prepetition wages, salaries, bonuses and other compensation; (b) employee medical and similar benefits; and (c) reimbursable expenses; (II) authorizing, but not directing, the Debtor to make deductions from employees' paychecks; and (III) authorizing and directing

banks and other financial institutions to pay all checks and electronic payment requests made

by the Debtor in relation to the foregoing pursuant to Sections 105(a), 363(b), 507(a)(4) and

507(a)(5) of the Bankruptcy Code.

44.     Currently the Debtor employs approximately sixteen (16) employees, nine (9) of

which are paid on salary (the "Salaried Employees") and seven (7) of which are paid hourly (the

"Hourly Employees") (collectively, the "Employees"). The Debtor also contracts with JPI, Inc.

("JPI") for part of its staffing. JPI is a staffing company owned solely by me. JPI provides

Debtor with approximately twenty-four (24) "leased" employees (the "JPI Staff") who assist

Debtor in manufacturing, finishing, molding, and other various tasks.

45.     The Debtor's Employees have various responsibilities which are all crucial to the

day-to-day operations of the Debtor and consist of a variety of positions, including but not

limited to senior management, accounting and bookkeeping, quality control, purchasing, sales and

logistics, production, finishing, and lab and tool making personnel. The Employees are familiar

with the day to day operations of the Debtor and many have relationships with customers which

are essential to the continued successful operations of the Debtor. To operate during this Chapter

11 case, the Debtor must retain its Employees' skills, knowledge and understanding of the

Debtor's infrastructure, operations and customer relations.

46.     To do so, the Debtor seeks to pay prepetition Employee-related obligations when

due.  I believe nonpayment of Employee compensation and benefits would severely undermine

morale and impose real hardship on the Employees and generate doubts about the stability of the

Debtor and its operational prospects.  Thus, by this Motion, the Debtor seeks authority to pay and/or honor, in its sole discretion certain prepetition claims or policies for, among other things: wages, salaries, and other compensation, federal, state, local and other withholding taxes and other amounts withheld (e.g. garnishment, child support, Employees' share of insurance premiums, taxes and 401(k) contributions), Employee health benefits, insurance benefits, workers' compensation benefits, vacation time, sick leave, paid leave, employee assistance plans, jury duty leave, bereavement leave, life insurance, short and long-term disability coverage, and certain other benefits that the Debtor has historically provided in the ordinary course of business (collectively, and as more fully described in the Employee Wages and Benefits Motion, the "Employee Wages and Benefits"), and to pay all costs incident to the foregoing including any payments to third party administrators or other administrative service providers.  Further, the Debtor requests the right to modify, change and discontinue any of the Employee Wages and Benefits, and to implement new Employee Wages and Benefits in the ordinary course of business during this Chapter 11 case, in its sole discretion, without the need for further Court approval.

47.     The Debtor pays its Salaried Employees on a semi monthly basis, on the day immediately following the end of a semi-monthly period, for the period which just ended. The Debtor pays its Hourly Employees on a weekly basis, one period in arrears, every Friday. Due to these payment delays, as of the Commencement Date, the Debtor has not paid its Employees all prepetition wages. As the Debtor's payroll runs in arrears, the Debtor is asking for authority to pay such amounts owed.

48.     The numbers reflected herein are for the amounts accrued but where no check or other payment has been made.   The Debtor's most recent weekly payroll was completed on Thursday, August 1, 2013.  This covered the pay period ended July 26, 2013. The Debtor's most recent semi-monthly payroll was also completed on Wednesday, July 31, 2013. This covered the pay period ended July 31, 2013. As a result, the Debtor has outstanding payroll obligations which have accrued. The Debtor requests authority to continue to honor, in the ordinary course of business, any outstanding payroll checks for current employees.  I do not believe any individual is owed  in  excess  of  $12,475.00  for  accrued  but  unpaid wages, which  I  have been  informed  by counsel is the maximum amount that may be considered priority payments.

49.     As the Debtor's payroll runs in arrears, the Debtor is asking for authority to pay such amounts owed, and is therefore estimating that, as of the Commencement Date, there will be  outstanding unpaid payroll, which  consists  of  accrued wages, salaries, overtime pay, in addition to other compensation earned prior to the Commencement Date as set forth in further detail in the Employee Wages and Benefits Motion.

50.     I believe  the  sum  of  the  prepetition Employee Wages  and Benefits  is relatively minimal  in amount when compared with  the  size  of  the Debtor's estate  and  the damage  to  the Debtor's Chapter  11 case  that would ensue  if Employee morale were  disrupted by  the Debtor's failure to meet its Employee Wages and Benefits obligations.

51.     Finally, the Debtor requests that banks and other financial institutions be authorized and directed to receive, process, honor and pay all checks presented for payment and

electronic payment requests related to the foregoing. The Debtor also seeks authority to issue new postpetition checks or fund transfer requests with respect to prepetition obligations that may have been dishonored by the banks in respect of the Employees' prepetition wages, benefits and deductions, if necessary.

**5) Motion of the Debtor and the Debtor in Possession for an Order Authorizing the Debtor to Pay Prepetition Sales Tax, CAT, and VAT Pursuant to Section 105(a) of the Bankruptcy Code**

52.     Under the above-referenced motion (the "Tax Motion"), the Debtor seeks entry of an order pursuant to section 105 of the Bankruptcy Code that authorizes, but does not direct, the Debtor to pay undisputed prepetition sales tax, CAT, and VAT obligations owed to the appropriate taxing authorities (the "Taxing Authorities") in the ordinary course of business, on an unaccelerated basis, as payments become due and payable. To the extent that a check issued prior to the Commencement Date has not cleared the bank as of the Commencement Date, the Debtor also seeks entry of a order (i) authorizing the Debtor's banks to honor such checks and/or any prepetition wire transfer requests and (ii) authorizing the Debtor to issue replacement checks, submit replacement fund transfer requests or provide other means of payment to the Taxing Authorities to the extent necessary to pay all undisputed prepetition sales tax, CAT, and VAT obligations.

53.     In connection with the normal operation of its business, the Debtor incurs various taxes and fees and collects taxes from its customers and other third parties (collectively,

the "Taxes") on behalf of various taxing authorities for payment to such authorities. The Debtor pays the Taxes to the various Taxing Authorities on a monthly, quarterly or yearly basis, depending on the particular Tax, as such payments become due and payable.

54.     On a periodic basis, the Debtor pays to the Taxing Authorities all taxes by funds drawn by check or by means of an electronic funds transfer.

55.     As of the Commencement Date, the Debtor's financial records indicate that the Debtor is substantially current on its payment of Taxes to all Taxing Authorities. Therefore, the Debtor seeks this relief out of an abundance of caution and to the extent that any Taxes accrued prepetition were not paid prepetition, paid in an amount that is less than actually owed, or if any payments sought to be made prepetition are rejected, lost or otherwise not received in full by any Taxing Authority.

56.     I believe that the failure to pay the Taxes could have a material adverse impact on the Debtor's ability to operate in the ordinary course of business and could result in the Debtor's officers and directors being held personally liable for the failure to pay the Taxes. Furthermore, the Debtor believes that the Taxing Authorities may cause the Debtor to be audited if certain of the Taxes are not paid, and such audits will unnecessarily divert the Debtor's attention from its business operations and reorganization. The payment of the Taxes is also necessary to avoid potential administrative difficulties. Withholding of payment of the Taxes will likely cause the Taxing Authorities to take immediate action, including an increase in state

audits and lien filings or motions for relief from stay.  Prompt and regular payment of the Taxes

will help avoid these unnecessary government actions.


57.      In addition, I am informed by counsel that the Taxes may be afforded

priority status under section 507(a)(8) of the Bankruptcy Code, and therefore, such taxes and fees

must be paid in full as a condition to confirmation of any plan of reorganization.

Accordingly, the payment of the taxes and fees affects the timing of the payment and

should not prejudice the rights of other creditors or reduce the ultimate distribution to

such creditors.   Further, to the extent that the Debtor has collected taxes from its customers

and such funds must be held in trust by the Debtor for the benefit of the Taxing Authorities,

such monies may not constitute property of the Debtor's estate.


58.      Accordingly, I respectfully submit that the payment of the Taxes and fees

is necessary for the continued operation of the Debtor's business.


**6) Emergency Motion of the Debtor/Debtor-in-Possession for an Order Authorizing**

**Maintenance of the Debtor's Existing Checks, Bank Accounts, and Business Forms**


59.      By the above referenced motion (the "Cash Management Motion"), the Debtor

seeks entry of an order authorizing it to maintain its existing checks, bank accounts, and business

forms. The Debtor seeks this authorization to insure its orderly entry into bankruptcy and to help

efficiently administer its business and void the disruption and distractions that would inevitably

divert the Debtor's attention from urgent matters during the initial stages of its bankruptcy case.

60.     The Debtor's business forms, letterhead and checks are all customized according to its ordinary business needs.  Because of the expense and disruption that would be incurred by the formulation of new forms containing the designation "Debtor in Possession," I believe it is in the best interest of the estate for the Debtor to continue to use its customized forms, checks, and letterhead during the course of this Chapter 11 case without placing the label "Debtor in Possession" on each separate check or form.

61.     In addition, the Debtor seeks a waiver of the requirement that new Bank Accounts be opened to replace all of the Debtor's existing Bank Accounts because such a requirement would unnecessarily disrupt the Debtor's business, impair their efforts to reorganize successfully and not provide any significant benefit to the Debtor' estates, their creditors or other parties in interest. I believe it is critical to the continued operation of the Debtor's business and the preservation of the value of its assets that the existing cash management system and Bank Accounts continue to be utilized without disruption.

62.     In the ordinary course of its business, the Debtor uses many pre-printed correspondence and business forms.  I believe the nature and scope of the Debtor's business and the numerous suppliers of goods and services require that the Debtor be permitted to continue using its existing pre-printed correspondence and business forms without alteration or modification.  Changing correspondence and business forms would be unnecessary and burdensome to the estate, as well as expensive and disruptive to the

Debtor's business operations.   I believe parties doing business with the Debtor will

undoubtedly be aware of the Debtor's status as Debtor in possession.


63.      The Debtor does business with hundreds of suppliers and customers, many of

which are large multi-national companies. Re-designating Debtor's accounts with these suppliers

and vendors will be a monumental task, and will likely result in payments by customers made to

the incorrect account, which will take time and resources to resolve, per Debtor's experience in

changing bank accounts in the past. Any interruption of cash flow at this critical time to the

Debtor could create a substantial hardship on the Debtor and could result in a loss of ability to do

business.


64.      Furthermore, the filing of the Debtor's bankruptcy petition will undoubtedly

be publicized within the business community, which I believe will place a strain on the

Debtor's relationships with its customers, vendors and other creditors that are essential to

its continued operations.  If the Debtor is required to substitute new debtor in possession bank

accounts for its existing Bank Accounts, these relationships will be further strained by the

payment delays and confusion that would result from opening the new accounts.   Consequently,

I believe that it is imperative that the Debtor be permitted to continue using the existing Bank

Accounts to avoid such unnecessary disruption of its business, efficiently administer its

bankruptcy cases and devote its efforts to a successful reorganization.   Although the

Debtor seeks authorization to utilize and retain its existing checks and bank accounts, the

Debtor will maintain its books and records so as to provide a clear line of demarcation

between prepetition and post-petition transactions and operations.  The Debtor further

represents that if the proposed relief is granted, it will not pay, and each of the Banks will be directed not to pay, any debts incurred before the Commencement Date, other than as authorized by this Court.

## III.  CONCLUSION

65.     In order to preserve and maximize the value of its business and successfully reorganize, the Debtor's immediate goal is to engage in business as usual following  the commencement of this Chapter 11 case.  I believe that, if the Court grants the relief requested in each respective First Day Motion, the prospect of achieving these objectives will be substantially enhanced to the benefit of the Debtor's estate, its creditors and other parties in interest.

I declare that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 5th day of August, 2013 at Dayton, Ohio.

/s/ John Prikkel III _____
John Prikkel III
Sole Member

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing Declaration of John Prikkel III was served this 6th day of August, 2013 by overnight mail on the following:

Office of the U.S. Trustee
170 North High Street, Suite 200
Columbus, Ohio 43215

Fifth Third Bank
38 Fountain Square Plaza
Cincinnati, OH 45263

Patricia L Hill, Esq.
1 South Main Street, Suite 900
Dayton, OH 45402

*Counsel for Fifth Third Bank*

Largest Twenty (20) Unsecured Creditors on Service List, attached to the court filed copy only.

and by electronic mail transmission upon the following:

Office of the U.S. Trustee
USTPRegion09.CB.ECF@usdoj.gov

Patricia L. Hill
*Statman, Harris & Eyrich, LLC*
plhill@statmanharris.com

*Counsel for Fifth Third Bank*

intl-mkt@rafael.co.il
Yedidia Yaari, Chief Executive Officer
Rafael Advanced Defense Systems, Ltd.

Johannes.Rabus@oppenhoff.eu
Rafael Advanced Defense Systems, Ltd.
c/o Oppenhoff & Partner

*Counsel for Rafael Advanced Defense Systems Ltd.*

/s/ Ira H. Thomsen
Ira H. Thomsen

*Proposed Case Attorney for the Debtor and Debtor-in-Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

IN RE:                                  *        CASE NO:  13-33232
                                        *        (Chapter 11)
LITEFLEX, LLC                           *        (Judge Lawrence S. Walter)
                                        *
              Debtor-in-Possession.     *


## Largest Twenty (20) Unsecured Creditors Service List

Air Handling Equipment
1389 Riverside Dr.
Sidney, OH 45365

American Contex
66 E. 83rd St
Suite 1-D
New York, NY 10028

Chembar Inc.
861 Taylor Rd, Ste E
Columbus, OH 43230

DP&L
City of Dayton Utility Bill
P.O. Box 740575
Cincinnati, OH 45263

Epcor Foundaries
Division of Seilkop Ind., Inc.
425 W North Bend Road
Cincinnati, OH 45216

Estee Mold & Die
1467 Stanley Avenue
Dayton, OH 45404

Evonik Corp
299 Jefferson Road
Parsippany, NJ 07054

I.V.C. Industrial Coatings
2831 East Industrial Park Dr.
Brazil, IN 47834

N-Stock Box, Inc.
1500 S. University Blvd.
P. O. BOX 305
Middletown, OH 45042

PPG Industries
940 Washburn Switch Road
Shelby, NC 28150

Palmer Holland
25000 County Club Blvd., Suite 444
North Olmsted, OH 44070

Panalpina
8500 Haggerty Road, Suite 100
Belleville, MI 48111

Paradigm Industrial
1345 Stanley Avenue
Dayton, OH 45404

RPS Technologies, Inc.
3211-B Dryden Road
Dayton, OH 45439

RAFAEL USA, Inc.
ATTN: Chief Executive Officer
6903 Rockledge Drive # 850
Bethesda, MD 20817

Rudolph Brothers
6550 Oley Speaks Way
Canal Winchester, OH 43110

Sepco-Erie
1221 Robinson Road West
Erie, PA 16509

T&T Graphics
2563 Technical Dr
Miamisburg, OH 45342

Tetra Mold & Tool Inc.
51 Quick Rd
New Carlisle, OH 45344

Univar USA Inc.
13009 Collections Center Drive
Chicago, IL 60693