## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

IN RE:                              *      CASE NO: 13-33232
                                    *      (Chapter 11)
LITEFLEX, LLC                       *      (Judge Lawrence S. Walter)
                                    *
        Debtor/Debtor-in-Possession. *
                                    *

## EMERGENCY MOTION OF THE DEBTOR/DEBTOR-IN-POSSESSION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR-IN-POSSESSION FINANCING FROM FIFTH THIRD BANK

Now Comes Liteflex, LLC, Debtor/Debtor-in-Possession herein ("Debtor"), and hereby makes this request for interim and final orders authorizing Debtor-in-Possession financing with Fifth Third Bank (also referred to as the "Secured Lender") upon those grounds and for the reasons set forth below.

## BACKGROUND

1.      On August 6, 2013, ("the Petition Date"), the Debtor filed a voluntary petition in this Court for reorganization relief under Chapter 11 of Title 11 of the United States Code ("the Bankruptcy Code"). The Debtor continues to operate its business as a Debtor-in-Possession under Sections 1107(a) and 1108 of the Bankruptcy Code.

2.      No creditors' committee has yet been appointed in this case by the United States Trustee. No trustee or examiner has been appointed in the Debtor's Chapter 11 case.

3.      This Court has jurisdiction over this Motion pursuant to 28 *U.S.C.* §§157 and 1334. Venue is proper pursuant to 28 *U.S.C.* §§1408 and 1409. This matter is a core proceeding under 28 *U.S.C.* §157(b)(2).

4.      The statutory predicates for the relief requested herein are Sections 105(a), 361, 363, and 364 of the Bankruptcy Code, Federal Bankruptcy Rules 2002, 4001, 6004, and 9014, and 4001-2 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Ohio (the "Local Bankruptcy Rules" or "LBR").

5.      The Debtor incorporates by reference herein and relies on, in support of the Motion, the Declaration of John Prikkel, III (the "Declaration") (*Doc*. 4).

6.      This motion is a "Motion to Obtain Credit" as defined and allowed under *LBR* 4001-2 and *LBR* 4001-3.

7.      The Debtor has one primary secured lender, Fifth Third Bank.

8.      Fifth Third Bank is secured by a lien on substantially all the pre-petition assets of the Debtor, including its cash and cash equivalents.

9.      On or about December 5, 2010, the Debtor entered into a credit agreement with Fifth Third Bank (The "Domestic Credit Agreement" or "DCA").  One of the components of the

DCA was a Line of Credit facility under which the Secured lender made advances to Debtor at

Debtor's request, subject to an asset-based formula, up to a maximum of $1,000,000.00 (the

"Revolving Note").  The principal balance on the Revolving Note as of the Petition date was

$783,000.00.

On or about April 1, 2013, the Debtor entered into a second credit agreement with Fifth

Third Bank (the "International Credit Agreement" or "ICA").  Under the ICA, the Secured

lender would make advances to the Debtor at Debtor's request, subject to a formula using non-

U.S. accounts receivable, up to a maximum of $1,000,000.00 (the "Revolving EX-IM Note").

There was no outstanding principal balance on the Revolving EX-IM Note as of the Petition date

and as of the Petition date the Debtor did not have access to the ICA line.

10.     Debtor is seeking authority to secure post-petition financing ("DIP Financing"),

which is the continued use of and access to the Domestic Credit Agreement through the

Revolving Note to provide necessary support for continued operations, pay professional and

statutory fees and allow Debtor to restructure its debt and reorganize its business.  The Debtor

makes the following disclosures as to the terms and conditions of the DIP Financing:

(a)     **DIP Facilities**:  The Domestic Credit Agreement and accompanying Revolving

Note (attached hereto as Exhibits "A" and "B" respectively).  This credit facility is an asset-

based loan, and the borrowing limits are subject to the terms and conditions of the respective

credit agreement.  There is no availability on the International Credit Agreement.

(b)      **DIP Lender**:  Fifth Third Bank

(c)      **Borrowing Conditions**:  Amounts to be loaned are determined by Debtor's

needs, up to $1,000,000.00 and subject to the terms and conditions in the Domestic Credit

Agreement.

(d)      **Interest**:  LIBOR plus 3.75%, or if an Interest Rate Event occurs as defined in the

DCA, Prime Rate plus .50%.

(e)      **Liens**:  Secured lender shall be regranted a continuing first security interest in and

lien, subject to the Carve-Out, upon all of the Debtor's right, title and interest in and to all of its

personal property and assets whether now owned or hereafter acquired.  The DIP Financing and

liens will not encumber or include any actions arising under Chapter 5 of the Bankruptcy Code.

(f)      **Carve Out**:  The DIP liens are subject and subordinate to the following (the

"Carve-Out"): (a) allowed administrative expenses pursuant to 28 *U.S.C.* §1930(a)(6) (the "U.S.

Trustee Fees"); and (b) allowed fees and expenses of attorneys and financial advisors employed

by Debtor and any Creditor's Committee pursuant to sections 327 and 1103 of the Bankruptcy

Code (the "Case Professionals").

## RELIEF REQUESTED AND APPLICABLE AUTHORITY

11.     Without the DIP Financing, the Debtor will be unable to fund the necessary expenses for operation of its business and for administration and completion of these Chapter 11 proceedings.  As such, Debtor has a compelling need to use the proceeds of the DIP Financing.

A.     *DIP Financing*

12.     If a Debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, then the Court, after notice and a hearing, may authorize the Debtor to obtain credit or incur debt:

(a)     with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code;

(b)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(c)     secured by a junior lien on property of the estate that is subject to a lien. 11 *U.S.C.* §364(c).

13.     *Rule* 4001(C) of the Bankruptcy Rules governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> "The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion.  If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."

*FRBP* 4001(c).  Accordingly, the Court is authorized to grant the relief requested herein.

14.     The Debtor is not able to secure necessary financing to assist with Debtor's operation of its business and costs of administration of these proceedings on any unsecured or

administrative priority basis.  The terms and provisions of the DIP Financing have been

negotiated in good faith.  In addition, the terms and provisions of the DIP Financing are fair and

reasonable under the circumstances and reflect the most favorable terms upon which the Debtor

could obtain the needed post-petition financing, and are a continuation of financing in place at

the time of the filing of the Petition.

15.     Having determined that financing was available only under Section 364(c) and (d)

of the Bankruptcy Code, the Debtor negotiated the DIP Financing pursuant to its business

judgment.  Provided that this judgment does not run afoul of the provisions of and policies

underlying the Code, courts grant a debtor considerable deference in acting in accordance with its

business judgment.  *See, Bray v. Shenandoah Fed. Sav. & Loan Ass'n*, 789 F.2d 1085, 1088 (4th

Cir. 1986) (approving debtor-in-possession financing necessary to sustain seasonal business); *see

also In re Ames Department Stores*, 115 B.R. 34, 40 (S.D.N.Y. 1990) ("Cases consistently reflect

that the Court's discretion under Section 364 is to be utilized on grounds that permit reasonable

business judgment to be exercised so long as the financing agreement does not contain terms that

leverage the bankruptcy process and powers or their purpose is not so much to benefit the estate

as it is to benefit parties in interest").

16.     The DIP Financing provides necessary additional liquidity to the Debtor and thus

will enable the Debtor, among other things, to (a) operate its business and successful completion

of its reorganization and (b) administer these Chapter 11 proceedings.

B.      *Carve-Out*

17.     The DIP Lender's liens and the Pre-Petition Lender's Liens are subject to a carve-out for Debtor's professional and statutory fees approved for payment during the Chapter 11 Case ("Ongoing Fee Carve-Out").

## NOTICE

18.     No trustee, examiner or creditors' committee has been appointed in this Chapter 11 case.  A copy of the Motion was served upon the following parties via telecopier, e-mail, ECF transmission, or overnight delivery, delivery prepaid, as soon as practicable after the entry of an order approving the form and manner of the First Day Notice on:  (i) The Office of the United States Trustee, 170 North High Street, Suite 200, Columbus, Ohio  43215, Attn:  Mary Anne Wilsbacher; (ii) The Twenty Largest Unsecured Creditors, and (iii) Patricia L. Hill, counsel for Secured Lender Fifth Third Bank, 1 South Main Street, Suite 900 Dayton, OH 45402, plhill@statmanharris.com,.   In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is required.  **Please take notice that the Debtor has filed a Motion for an Expedited Hearing to consider certain First Day Motions and Applications, including the foregoing.  The Debtor shall serve notice of the expedited hearing date pursuant to further order(s) of this Court.**

## NO PRIOR REQUEST

19.     No previous request for relief requested herein has been made to the Court in the Chapter 11 Case.

WHEREFORE, the Debtor respectfully requests that the Court authorize the Debtor to receive advances under the DIP Financing, on the terms as set forth in the attached Proposed Agreed Interim Order, and for all other just and proper relief.

Respectfully submitted,

/s/ Ira H. Thosmen
Ira H. Thomsen (0023965)
Denis E. Blasius (0082617)
140 North Main Street
Springboro, OH 45066
937-748-5001
937-748-5003 (Fax)
Cornell76@aol.com
dblasius@ihtlaw.com

*Law Offices of Ira H. Thomsen*
*Proposed Case Attorney and Counsel for Debtor*
*and Debtor-in-Possession*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing ***Emergency Motion of the Debtor/Debtor-in-Possession for Interim and Final Orders Authorizing Debtor-in-Possession Financing from Fifth Third Bank*** was served this 6th day of August, 2013 by overnight mail on the following:

Office of the U.S. Trustee
170 North High Street, Suite 200
Columbus, Ohio 43215

Fifth Third Bank
38 Fountain Square Plaza
Cincinnati, OH 45263

Patricia L Hill, Esq.
1 South Main Street, Suite 900
Dayton, OH 45402

*Counsel for Fifth Third Bank*

Largest Twenty (20) Unsecured Creditors on Service List, attached to the court filed copy only.

and by electronic mail transmission upon the following:

Office of the U.S. Trustee
USTPRegion09.CB.ECF@usdoj.gov

Patricia L. Hill
*Statman, Harris & Eyrich, LLC*
plhill@statmanharris.com

*Counsel for Fifth Third Bank*

intl-mkt@rafael.co.il
Yedidia Yaari, Chief Executive Officer
Rafael Advanced Defense Systems, Ltd.

Johannes.Rabus@oppenhoff.eu
Rafael Advanced Defense Systems, Ltd.
c/o Oppenhoff & Partner

*Counsel for Rafael Advanced Defense Systems Ltd.*

/s/ Ira H. Thomsen
Ira H. Thomsen

*Proposed Case Attorney for the Debtor and
Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| IN RE: | * | CASE NO:  13-33232 |
| | * | (Chapter 11) |
| LITEFLEX, LLC | * | (Judge Lawrence S. Walter) |
| | * | |
| Debtor-in-Possession. | * | |

### Largest Twenty (20) Unsecured Creditors Service List

Air Handling Equipment
1389 Riverside Dr.
Sidney, OH 45365

American Contex
66 E. 83rd St
Suite 1-D
New York, NY 10028

Chembar Inc.
861 Taylor Rd, Ste E
Columbus, OH 43230

DP&L
City of Dayton Utility Bill
P.O. Box 740575
Cincinnati, OH 45263

Epcor Foundaries
Division of Seilkop Ind., Inc.
425 W North Bend Road
Cincinnati, OH 45216

Estee Mold & Die
1467 Stanley Avenue
Dayton, OH 45404

Evonik Corp
299 Jefferson Road
Parsippany, NJ 07054

I.V.C. Industrial Coatings
2831 East Industrial Park Dr.
Brazil, IN 47834

N-Stock Box, Inc.
1500 S. University Blvd.
P. O. BOX 305
Middletown, OH 45042

PPG Industries
940 Washburn Switch Road
Shelby, NC 28150

Palmer Holland
25000 County Club Blvd., Suite 444
North Olmsted, OH 44070

Panalpina
8500 Haggerty Road, Suite 100
Belleville, MI 48111

Paradigm Industrial
1345 Stanley Avenue
Dayton, OH 45404

RPS Technologies, Inc.
3211-B Dryden Road
Dayton, OH 45439

RAFAEL USA, Inc.
ATTN: Chief Executive Officer
6903 Rockledge Drive # 850
Bethesda, MD 20817

Rudolph Brothers
6550 Oley Speaks Way
Canal Winchester, OH 43110

Sepco-Erie
1221 Robinson Road West
Erie, PA 16509

T&T Graphics
2563 Technical Dr
Miamisburg, OH 45342

Tetra Mold & Tool Inc.
51 Quick Rd
New Carlisle, OH 45344

Univar USA Inc.
13009 Collections Center Drive
Chicago, IL 60693

**PROPOSED ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| IN RE: | * | CASE NO: <u>13-33232</u> |
| | * | (Chapter 11) |
| LITEFLEX, LLC | * | (Judge Lawrence S. Walter) |
| | * | |
| Debtor-in-Possession. | * | |

---

**AGREED INTERIM ORDER GRANTING DEBTOR'S EMERGENCY MOTION OF THE DEBTOR/DEBTOR-IN-POSSESSION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR-IN-POSSESSION FINANCING FROM FIFTH THIRD BANK**

---

This matter is before the Court on the *Emergency Motion of the Debtor/Debtor-in-Possession for Interim and Final Orders Authorizing Debtor-in-Possession Financing from Fifth*

*Third Bank* of Liteflex, LLC ("Debtor") (*Doc.* __), the Debtor and Debtor-in-Possession in the

above-captioned Chapter 11 case, seeking entry of an order authorizing the Debtor to obtain

post-petition financing pursuant to 11 *U.S.C.* §105, 362 and 364(c)(3) (the "Financing Motion").

Upon consideration of the Financing Motion, and upon the record of the hearing held

thereon, the Court being duly advised finds that: (i) the Debtor continues to operate its business

and manage its properties as a debtor in possession to 11 *U.S.C.* §§1107(a) and 1108; (ii) no

trustee or examiner has been appointed; (iii) it has jurisdiction over the matters raised in the

Financing Motion pursuant to 28 *U.S.C.* §§157 and 1334; (iv) this is a core proceeding pursuant

to 28 *U.S.C.* §157(b)(2); (v) venue is proper before this Court pursuant to 28 *U.S.C.* §§1408 and

1409; (vi) the Debtor has satisfied the requirements of Sections 105(a) and 364(c) and (d) of the

Bankruptcy Code that authorization to incur postpetition debt under the terms and conditions of

the DIP Financing[1] and as set forth in the Financing Motion is in the best interests of the Debtor

and its estate, and is necessary in the Debtor's reorganization efforts; (vii) proper and adequate

notice of the Financing Motion and the hearing thereon has been served and no other or further

notice is necessary; (viii) granting the relief requested is necessary to preserve and maximize

assets of the estate; and (ix) upon the record in this case and after due deliberation good and

sufficient cause exists for the granting of the relief requested.  Accordingly,

IT IS HEREBY ORDERED that:

1.      The Financing Motion is GRANTED.

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Financing Motion.

2.      The Debtor is hereby authorized to obtain the post-petition financing pursuant to the terms set forth in the Financing Motion.

3.      The DIP Financing shall constitute valid, binding obligations of the Debtor, enforceable against the Debtor.

4.      The terms of the DIP Financing are fair and reasonable, reflect the Debtor's exercise of prudent business judgment, have been negotiated in good faith, and at arm's length between the Debtor and the Secured Lender; and any credit extended, loans made and other financial accommodations extended to the Debtor by the Secured Lender shall be deemed to have been extended or made, as the case may be, in good faith within the meaning of Section 364(e) of the Bankruptcy Code.

5.      The Debtor is also authorized to make payments authorized under other orders entered by this Court, including for payment to professional and other administrative expenses.

6.      The relief granted under this Order as authority to incur the DIP Financing is authorized per the following terms and conditions as set forth in the Financing Motion:

(a)     **DIP Facilities**:  The Domestic Credit Agreement and accompanying Revolving Note (Exhibits A and B to the Financing Motion respectively).  These credit facilities are asset-based loans, and the borrowing limits are subject to the terms and conditions of the respective Credit Agreement.  There is no availability on the International Credit Agreement.

(b)     **DIP Lender**:  Fifth Third Bank

**(c)**   <u>**Borrowing Conditions**</u>:  Amounts to be loaned are determined by Debtor's

needs, up to $1,000,000.00 and subject to the terms and conditions in the Domestic Credit

Agreement.

**(d)**   <u>**Interest**</u>:  LIBOR plus 3.75%, or if an Interest Rate Event occurs as defined in the

DCA, Prime Rate plus .50%..

**(e)**   <u>**Liens**</u>:  Secured lender shall be regranted a continuing first security interest in and

lien, subject to the Carve-Out, upon all of the Debtor's right, title and interest in and to all of its

personal property and assets whether now owned or hereafter acquired.  The DIP Financing and

liens will not encumber or include any actions arising under Chapter 5 of the Bankruptcy Code.

**(f)**   <u>**Carve Out**</u>:  The DIP liens are subject and subordinate to the following (the

"Carve-Out"): (a) allowed administrative expenses pursuant to 28 *U.S.C.* §1930(a)(6) (the "U.S.

Trustee Fees"); and (b) allowed fees and expenses of attorneys and financial advisors employed

by Debtor and any Creditor's Committee pursuant to sections 327 and 1103 of the Bankruptcy

Code (the "Case Professionals").

**a)**   **This Court, having found that the DIP Financing is necessary to avoid
immediate and irreparable harm to the estate pending a final hearing, the authorization to
incur DIP Financing pursuant to this Order shall continue until this Court shall hold a
final hearing, pursuant to section 364(d)(1) of the Bankruptcy Code and Federal
Bankruptcy Rule 4001(C)(2).**

**b)**   **NOTICE: Please take notice that this Agreed Interim Order Granting
Debtor's Emergency Motion of the Debtor/Debtor-in-Possession for Interim and Final**

Orders Authorizing Debtor-in-Possession Financing from Fifth Third Bank and Notice of Objection Deadline (the "Order"), has been approved by the Court.

Your rights may be affected.  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult one.)

If you do not want the Court to enter a final Order or if you want the Court to consider your views on the Order then, on or before twenty-one (21) days from the date of the filing of this Order you or your attorney must:

File with the Court an objection explaining your position at:

Clerk of Courts
United States Bankruptcy Court
120 West Third Street
Dayton, OH  45402

If you mail your objection to the Clerk of Court for filing, you must mail it early enough so that the Clerk and the following person will receive it on or before twenty-one (21) days from the date of the filing of this Order:

Ira H. Thomsen
Attorney at Law
140 North Main Street, Suite A
P.O. Box 639
Springboro, Ohio  45066

Office of the U.S. Trustee
170 North High Street, Suite 200
Columbus, Ohio  43215

Patricia L. Hill, Esq.
Statman, Harris & Eyrich
One South Main Street
Suite 900

**Dayton, Ohio  45402**

**If you or your attorney do not take these steps, the Court may decide that you do not oppose the Order becoming a final Order and may enter a final Order granting that relief without further notice or hearing.**

IT IS SO ORDERED.

AGREED TO AND CONSENTED BY:

STATMAN HARRIS & EYRICH, LLC


/s/ Patricia L. Hill (per electronic mail authority)
Patricia L Hill (0072595)
1 South Main Street, Suite 900
Dayton, OH 45402
937-222-1090
937-222-1046 (fax)
notices@statmanharris.com


*Attorneys for Fifth Third Bank*


AND

/s/ Ira H. Thomsen
Ira H. Thomsen (0023965)
Denis E. Blasius (0082617)
140 North Main Street, Suite A
P.O. Box 639
Springboro, OH 45066
937/748-5001
937/748-5003 (fax)
cornell76@aol.com

*Proposed Case Attorney and Counsel*
*for Debtor/Debtor-in-Possession Liteflex, LLC*

Copies to:

Default List Plus Top 20

Patricia L Hill, Esq.
1 South Main Street, Suite 900
Dayton, OH 45402

###

Exhibit A

## CREDIT AGREEMENT

This Credit Agreement (the "Agreement") is entered into as of December **15**, 2010 (the "Effective Date"), by and between **LITEFLEX LLC,** an Ohio limited liability company ("Liteflex"), **BRANDT MANUFACTURING LLC,** an Ohio limited liability company ("Brandt", and together with Liteflex, collectively, the "Borrower"), and **FIFTH THIRD BANK,** an Ohio banking corporation ("Bank")

Section 1      Definitions

Certain capitalized terms have the meanings set forth on Exhibit 1 hereto or in the Security Agreement  All financial terms used in this Agreement but not defined on Exhibit 1 have the meanings given to them by GAAP  All terms defined in the UCC and used, and not otherwise defined herein, shall have the meanings ascribed thereto in the UCC

Section 2.      Loans.

2.1.      Revolving Loans.  (a)  Subject to the terms and conditions hereof, Bank extends to Borrower a line of credit facility (the "Revolving Facility") under which Bank will make loans (the "Revolving Loans") to Borrower at Borrower's request from time to time during the term of this Agreement, provided, however, that the total amount of Revolving Loans outstanding at any time shall not exceed the following (the "Maximum Amount"): the lesser of (i) the Revolving Credit Commitment or (ii) the Borrowing Base  Bank may create and maintain reserves from time to time based on such credit and collateral considerations as Bank may reasonably deem appropriate  Borrower may borrow, prepay (without penalty or charge), and reborrow under the Revolving Facility, provided that the principal amount of all Revolving Loans outstanding at any one time under the Revolving Facility will not exceed the Maximum Amount  If the amount of Revolving Loans outstanding at any time under the Revolving Facility exceeds the Maximum Amount, Borrower will immediately pay the amount of such excess to Bank in cash  In the event Borrower fails to pay such excess, Bank may, in its discretion, setoff such amount against Borrower's accounts at Bank

(b)      The Revolving Loan proceeds will be used to refinance indebtedness with PNC Bank, for working capital purposes, and for other corporate purposes

(c)      On the Effective Date, Borrower will execute and deliver to Bank a Revolving Note in form satisfactory to Bank (the "Revolving Note"), in the principal amount of the Revolving Credit Commitment

(d)      The Revolving Note will bear interest at the LIBOR Rate plus 3.750%.  If an Interest Rate Event occurs, the Revolving Note will bear interest at the Prime Rate plus 50%.  Borrower will make payments of interest on the Revolving Note on the first day of each month

(e)      If an automated borrowing feature is in place for the Revolving Facility, Bank shall advance Revolving Loans sufficient to pay all checks issued by Borrower and presented to Bank for payment on such date up to the Maximum Amount  If an automated borrowing feature is not in place for the Revolving Facility, Borrower must give Bank written notice of its intention to borrow under this Agreement not later than 2:00 P.M. (Central Standard time) on the Business Day of the proposed borrowing date for Revolving Loans  Bank is authorized to make Revolving Loans based on written or oral instructions received from anyone purporting to be an authorized representative of Borrower

(f)     The term of the Revolving Facility will expire on the Termination Date, and the Revolving Note will become payable in full on that date. Borrower may prepay the principal balance of the Revolving Note in whole or part at any time without penalty.

2.2     Term Loan.  (a) Subject to the terms and conditions hereof, Bank agrees to make a term loan ("Term Loan") to Borrower on the Effective Date in the amount of Six Hundred Thousand Dollars ($600,000.00) (the "Term Loan Commitment.") Borrower's obligation to pay the Term Loan will be evidenced by its promissory note ("Term Note") in form satisfactory to Bank.

(b)     The Term Note will bear interest at the LIBOR Rate plus 4.250%. If an Interest Rate Event occurs, the Revolving Note will bear interest at the Prime Rate plus 1.00%. Borrower will make payments of interest on the Term Note on the first day of each month.

(c)     Beginning on January 1, 2011, the Borrower will make monthly installments payments of principal in the amount of **$10,000.00** each on the first day of each month.

(d)     The entire outstanding principal balance of the Term Loan, plus all accrued and unpaid interest, will be due and payable on the Term Note Maturity Date.

(e)     Borrower may prepay all or part of the Term Note, without premium or penalty, which prepaid amounts shall be applied to the amounts due in reverse order of their due dates.

(f)     The proceeds of the Term Loan will be used to refinance indebtedness to PNC Bank which was used for purchase of Benteler tooling and equipment.

2.3     Interest Rate Calculation; Payments   (a) Interest on the Revolving Note shall be calculated based on a 360 day year and charged for the actual number of days elapsed.

(b)     Fees stated as an annual rate shall be calculated on the basis of a year of 360 days, and charged for the actual number of days occurring in the period for which such fees are payable. Each determination by Bank of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(c)     All payments of principal and interest made by Borrower shall be made no later than 2:00 P.M., on the Business Day such payments are due. All amounts paid after such time will be credited on the following date. All payments received by Bank will be applied first to payment of amounts advanced by Bank on behalf of Borrower or which may be due for insurance, taxes and attorneys' fees or other charges to be paid by Borrower, then to accrued interest on the Note, in such order as the Bank shall determine, then to principal on the Note, in such order as the Bank shall determine.

(d)     Any principal amount not paid when due (at maturity, by acceleration or otherwise) will bear interest thereafter until paid at the Default Rate; this provision does not constitute a waiver of any Events of Default or an agreement by Bank to permit any late payments whatsoever.

2.4     Note Processing Fee   Borrower will pay to Bank a note processing fee in the amount of $500.00 for each of the Revolving Note and Term Note, for a total of $1,000.00.

2.5     Field Audit.  Bank shall have the right to perform field audits of Borrower as reasonably requested by Bank. Borrower shall fully cooperate with Bank in regards to such field audit and shall give Bank access to all books and records and Borrower's facilities for such field audit during normal business

hours. Borrower shall pay all of Bank's costs and expenses in connection with the field audits, which are limited to the actual per diem charge of the auditors plus out of pocket expenses; provided, however, that unless an Event of Default exists, Borrower shall not be required to pay for more than two field audits per calendar year.

Section 3.     Representations And Warranties   Borrower hereby warrants and represents to Bank the following:

3.1     Organization and Qualification   Each Borrower is duly organized, validly existing and in good standing under the laws of its state of organization, has the power and authority to carry on its business and to enter into and perform this Agreement and the other Loan Documents, and is qualified and licensed to do business in each jurisdiction in which such qualification or licensing is required except where the failure to so qualify would not have a Material Adverse Effect. All information provided to Bank with respect to Borrower and its operations is true and correct in all material respects. Except as set forth on Schedule 3.1, the Borrower has not, during the past five years, been known by or used any other corporate or fictitious name, or been a party to any merger or consolidation, or been a party to any acquisition.

3.2     Due Authorization   The execution, delivery and performance by Borrower of this Agreement and the other Loan Documents have been duly authorized by all necessary action, and will not (a) contravene the organizational documents of Borrower, (b) violate any Material agreement or instrument by which Borrower is bound or any law or governmental rule or order binding on Borrower or (c) result in the creation of a Lien on any assets of Borrower except the Lien granted to Bank. Borrower has duly executed and delivered this Agreement and the other Loan Documents and they are valid and binding obligations of Borrower enforceable according to their respective terms except as limited by equitable principles and by bankruptcy, insolvency or similar laws affecting the rights of creditors generally. Other than the filings contemplated by the Loan Documents, no notice to or consent by any governmental body is needed in connection with this transaction.

3.3     Litigation   There are no Material suits, arbitrations, investigations, claims, inquiries, or proceedings pending or to the Borrower's knowledge, threatened against or affecting Borrower, and no proceedings before any governmental body are pending or threatened against Borrower except as set forth on Schedule 3.3.

3.4     Margin Stock   No part of the Loans will be used to purchase or carry, or to reduce or retire or refinance any credit incurred to purchase or carry, any margin stock (within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System) or to extend credit to others for the purpose of purchasing or carrying any margin stock. If requested by Bank, Borrower will furnish to Bank statements in conformity with the requirements of Federal Reserve Form U-1.

3.5     Business   Borrower is not a party to or subject to any agreement or restriction which in the opinion of Borrower's management is so unusual or burdensome that it is reasonably likely to have a Material Adverse Effect.

3.6     Licenses, etc.   Borrower owns or possesses the right to use all licenses, permits, franchises, governmental authorizations, patents, trademarks, copyrights or other rights necessary for the ownership of its properties and conduct of its business as now conducted, or as presently contemplated to be conducted (collectively, the "Intellectual Property Rights"), and all such licenses and authorizations are in full force and effect. Schedule 3.6 attached hereto sets forth a complete list of the Intellectual Property Rights of Borrower and all applications therefor. To the knowledge of Borrower, such licenses, patents, copyrights, trademarks, and trade names do not conflict with the rights of any other person or

3

entity   All of the foregoing are in full force and effect and none of the foregoing are in known conflict with the rights of others.

3.7     Laws and Taxes   Borrower is in compliance with all laws, regulations, rulings, orders, injunctions, decrees, conditions or other requirements applicable to or imposed upon Borrower by any law or by any governmental authority, court or agency except where the failure to be in compliance will not have a Material Adverse Effect   Borrower has filed all required tax returns and reports that are now required to be filed by it in connection with any federal, state and local tax, duty or charge levied, assessed or imposed upon Borrower or its assets, including unemployment, social security, and real estate taxes   Borrower has paid all taxes which are now due and payable.  No taxing authority has asserted or assessed any additional tax liabilities against Borrower which are outstanding on the Effective Date, and Borrower has not filed for any extension of time for the payment of any tax or the filing of any tax return or report.

3.8     Financial Condition.  All financial information relating to Borrower which has been or may hereafter be delivered by Borrower or on its behalf to Bank is true and correct and Borrower's financial statements have been prepared in accordance with GAAP.  Borrower has no Material obligations or liabilities of any kind not disclosed in that financial information, and there has been no material adverse change in the financial condition of Borrower nor has Borrower suffered any damage, destruction or loss which has adversely affected its business or assets since the submission of the most recent financial information to Bank.

3.9     Title   Borrower has good and marketable title to the assets reflected on the most recent balance sheets submitted to Bank, free and clear from all liens and encumbrances of any kind, except for (a) liens and encumbrances, if any, reflected or noted on such balance sheet or notes thereto, (b) assets disposed of in the ordinary course of business, and (c) Permitted Liens.

3.10    Defaults.  Except as set forth on Schedule 3.10, Borrower is in compliance with all Material agreements applicable to it and there does not now exist any default or violation by Borrower of or under any of the terms, conditions or obligations of (a) its organizational documents or (b) any indenture, mortgage, deed of trust, franchise, permit, contract, agreement or other instrument to which Borrower is a party or by which it is bound.

3.11    Environmental Laws.   (a)   Borrower has obtained all permits, licenses and other authorizations or approvals which are required under Environmental Laws and Borrower is in compliance in all material respects with all terms and conditions of the required permits, licenses, authorizations and approvals, and is also in compliance in all material respects with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in the Environmental Laws.

(b)     Borrower is not aware of, and has not received notice of, any past, present or future events, conditions, circumstances, activities, practices, incidents, actions or plans which may interfere with or prevent compliance or continued compliance by Borrower, in any material respect, with Environmental Laws, or may give rise to any material common law or legal liability, or otherwise form the basis of any claim, action, demand, suit, proceeding, hearing, study or investigation, based on or related to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling or the emission, discharge, release or threatened release into the environment, of any pollutant, contaminant, chemical, or industrial, toxic or hazardous substance or waste.

(c)      There is no civil, criminal or administrative action suit, demand, claim, hearing, notice or demand letter, notice of violation, investigation or proceeding pending or to the best of Borrower's knowledge, threatened against Borrower relating in any way to Environmental Laws.

3.12      Subsidiaries and Partnerships.   Borrower has no subsidiaries and is not a party to any partnership agreement or joint venture agreement except as set forth on Schedule 3.12.

3.13      ERISA.   Borrower and all individuals or entities that along with Borrower would be treated as a single employer under ERISA or the Internal Revenue Code of 1986, as amended (an "ERISA Affiliate"), are in compliance with all of their obligations to contribute to any "employee benefit plan" as that term is defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, and any regulations promulgated thereunder from time to time ("ERISA").  Borrower and each of its ERISA Affiliates are in full compliance with ERISA, and there exists no event described in Section 4043(b) thereof ("Reportable Event").   There are no pending or, to the knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any governmental authority, with respect to any "employee benefit plan" of Borrower that has or could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any "employee benefit plan" of Borrower that has or could reasonably be expected to have a Material Adverse Effect.

3.14      Ownership and Management.   The names of the record and beneficial owners of all of the issued and outstanding membership interests of Borrower is disclosed in Schedule 3.14 attached hereto. All outstanding membership interests of Borrower have been duly authorized, validly issued and are fully paid and non-assessable.  Except as disclosed in Schedule 3.14, there are no outstanding subscriptions, warrants, calls, options, rights, commitments or agreements by which Borrower is bound providing for the issuance of membership interests, or for the issuance of any securities convertible or exchangeable, actually or contingently, into ownership interests of Borrower.  Schedule 3.14 contains a complete list of all members, managers and officers of the Borrower.

3.15      Property Locations   (a) Schedule 3.15 attached hereto contains a true, accurate, and complete list of (i) all real property owned in fee simple by the Borrower, and (ii) all leases, subleases, or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each real property asset of the Borrower, regardless of whether Borrower is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease, or assignment.  As of the Effective Date, except as specified in Schedule 3.15, each agreement referenced in clause (ii) of the immediately preceding sentence is in full force and effect and the Borrower does not have knowledge of any default that has occurred and is continuing thereunder (except where the consequences, direct or indirect, of such default or defaults, if any, would not reasonably be expected to have a Material Adverse Effect), and each such material agreement constitutes the legally valid and binding obligation of the Borrower, enforceable against such Borrower in accordance with its terms.

(b)      Schedule 3.15 sets forth the location of (i) the chief executive office of Borrower, and (ii) the office where Borrower keeps its records concerning its Inventory, Accounts, contracts and other properties, (iii) each place of business of Borrower, including the location of the Borrower's Inventory and equipment, together with the name and address of each Person other than Borrower having possessory rights (as owner, landlord, warehouseman, or otherwise) to such locations.

3.16      Labor Relations.   Borrower is not a party to any collective bargaining agreement, there is no strike or request for union representation, no material labor dispute, grievance or controversy pending, or, to the knowledge of the Borrower, threatened against Borrower, including without limitation, any work stoppages, slowdowns or lockouts   There are no matters relating to the Borrower pending before

the National Labor Relations Board or any similar state or local labor agency, nor, to the best of the Borrower's knowledge, is the Borrower engaged in any unfair labor practices, and the Borrower believes it has good labor relations with its employees.

3 17     Solvency. As of the date hereof and after giving effect to the transactions contemplated by the Loan Documents, (i) the aggregate value of the Borrower's assets will exceed its liabilities (including contingent, subordinated, unmatured and unliquidated liabilities), (ii) the Borrower will have sufficient cash flow to enable it to pay its debts as they become due, and (iii) the Borrower will not have unreasonably small capital for the business in which it is engaged

Section 4.     Affirmative Covenants  The Borrower agrees that from the Effective Date until all Obligations have been paid in full and any commitments of the Bank to the Borrower have been terminated, Borrower will:

4.1     Books and Records. Borrower will maintain proper books of account and records and enter therein complete and accurate entries and records of all of its transactions in accordance with GAAP and give representatives of Bank access thereto at all reasonable times during normal business hours upon reasonable advance notice (unless an Event of Default exists) to discuss Borrower's affairs, finances and accounts, including permission to examine, copy and make abstracts from any such books and records and such other information which might be helpful to Bank in evaluating the status of the Loans as it may reasonably request from time to time  In furtherance thereof, Borrower hereby authorizes all of such Persons to discuss the same with representatives of the Bank at such times and as often as the Bank may reasonably request  Borrower will give Bank reasonable access to the Collateral and the other property securing the Obligations at reasonable times for the purpose of performing examinations thereof and to verify its condition or existence.  If the Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, the Borrower, upon request of the Bank, shall notify such party to permit the Bank free access to such records at all reasonable times and to provide the Bank with copies of any records it may request, all at the Borrower's expense Notwithstanding any of the foregoing, after the occurrence and during the continuance of an Event of Default, the Bank may do any of the foregoing as often as the Bank may desire at any time and without advance notice

4 2     Financial Statements.  Borrower will maintain a standard and modern system for accounting and will furnish to Bank:

(a)     Within thirty (30) days after the end of each month, Borrower's internally prepared consolidated financial statements for that month and for the year to date in a form reasonably acceptable to Bank and in accordance with GAAP, which shall be  complete and correct, subject only to changes resulting from year-end adjustments, by a duly authorized  Officer;

(b)     Within one hundred twenty (120) days after the end of each fiscal year, Borrower's internally prepared consolidated financial statements for the year in a form reasonably acceptable to Bank and in accordance with GAAP, which shall be complete and correct, subject only to changes resulting from year-end adjustments, by a duly authorized Officer;

(c)     Within one hundred twenty (120) days after the end of each fiscal year, a copy of Borrower's consolidated financial statements in accordance with GAAP for that year reviewed by a firm of independent certified public accountants acceptable to Bank (which acceptance will not be unreasonably withheld), and accompanied by a standard review verification of such accountants without qualification;

6

(d)     Within forty-five (45) days after the end of each fiscal quarter, a Compliance Certificate signed by a duly authorized Officer: (i) stating he is familiar with the Loan Documents and that no Default or Event of Default, has occurred, or if any such condition or event existed or exists, specifying it and describing what action Borrower has taken or propose to take with respect thereto, and (ii) setting forth, in summary form, figures showing the financial status of Borrower in respect of the financial covenants contained in this Agreement and showing a comparison of both monthly and year to date results in comparison to the projections;

(e)     Upon request, copies of all federal, state and local income tax returns and such other information as Bank may reasonably request;

(f)     Within twenty (20) days after the end of each month or upon a shorter frequency at Bank's option, a Borrowing Base Certificate, Accounts Receivable Aging Report and Inventory Summary Report, each in the form regularly used by Bank's commercial loan customers; and

(g)     Such other financial and collateral documents as reasonably requested by Bank within five (5) business days of such request.

If at any time Borrower has any Subsidiaries whose financial statements should be consolidated with Borrower under GAAP, the financial statements required by subsections (a) and (b) above will be the financial statements of Borrower and all such Subsidiaries prepared on a consolidated and consolidating basis.

4.3     Condition and Repair.   Borrower will maintain its assets in good repair and working order ordinary wear and tear excepted and will make all appropriate repairs and replacements thereof, based upon the current condition of the assets at the time of the execution of this Agreement.  It is acknowledged that certain assets and equipment of the Borrower are not currently being utilized in the operations of the Borrower.

4.4     Insurance.   Borrower will insure its properties and business against loss or damage of the kinds and in the amounts customarily insured against by corporations with established reputations engaged in the same or similar business as Borrower.  All such policies will (a) be issued by financially sound and reputable insurers, (b) name Bank as an additional insured and, where applicable, as loss payee under a lender loss payable endorsement satisfactory to Bank, and (c) will provide for thirty (30) days written notice to Bank before such policy is diminished or canceled, all of which will be evidenced by a Certificate of Insurance delivered to Bank by Borrower on the Effective Date.

4.5     Taxes.   Borrower will pay when due all taxes, assessments and other governmental charges imposed upon it or its assets, franchises, business, income or profits before any penalty or interest accrues thereon, and all claims (including, without limitation, claims for labor, services, materials and supplies) for sums which by law might be a lien or charge upon any of its assets, provided that (unless any material item or property would be lost, forfeited or materially damaged as a result thereof) no such charge or claim need be paid if it is being diligently contested in good faith, if Bank is notified in advance of such contest and if Borrower establishes an adequate reserve or other appropriate provision required by GAAP and deposits with Bank cash or bond in an amount acceptable to Bank.

4.6     Existence; Business.   Borrower will (a) maintain its existence, (b) engage primarily in business of the same general character as that now conducted, and (c) refrain from entering into any lines of business substantially different from the business or activities in which Borrower is presently engaged.

4.7     Compliance with Laws.  Borrower will comply with all federal, state and local laws, regulations and orders applicable to Borrower or its assets including but not limited to all Environmental Laws, in all respects material to Borrower's business, assets or prospects and will immediately notify Bank of any violation of any rule, regulation, statute, ordinance, order or law relating to the public health or the environment and of any complaint or notifications received by Borrower regarding to any environmental or safety and health rule, regulation, statute, ordinance or law.

4.8     Notice of Default.  Borrower will, within five (5) Business Days of its knowledge thereof, give written notice to Bank of: (a) the occurrence of any Default or Event of Default and what action Borrower has taken or is taking or proposes to take in respect thereof, and (b) the occurrence of any event or the existence of any condition which would prohibit Borrower from continuing to make the representations set forth in this Agreement.

4.9     Depository/Banking Services.  So long as this Agreement is in effect, Bank will be the primary depository in which the majority of Borrower's funds are deposited, and the primary bank of account of Borrower, and Borrower will grant Bank an opportunity to provide any corporate banking services required by Borrower and its Affiliates, including, without limitation, payroll, cash management and employee benefit plan services.

4.10    Other Amounts Deemed Loans.   If Borrower fails to pay any tax, assessment, governmental charge or levy or to maintain insurance within the time permitted or required by this Agreement, or to discharge any Lien prohibited hereby, or to comply with any other Obligation, Bank may, but shall not be obligated to, pay, satisfy, discharge or bond the same for the account of Borrower, and to the extent permitted by law and at the option of Bank, all monies so paid by Bank on behalf of Borrower will be deemed Loans and Obligations under the Revolving Facility.

4.11    Payment of Liabilities.  Except to the extent the validity or amount thereof is being contested in good faith and by appropriate proceedings with reserves maintained in amounts satisfactory to the Bank, the Borrower shall pay or discharge or cause to be paid or discharged: (i) on or prior to the date when due, all lawful claims of materialmen, mechanics, carriers, warehousemen, landlords and other like Persons that, if unpaid, might result in the creation of a Lien upon any property of the Borrower; (ii) on or prior to the date when due, all other lawful claims which, if unpaid, might result in the creation of a Lien upon any property of the Borrower; and (iii) all other current liabilities of the Borrower which are overdue more than sixty (60) days.

4.12    Costs.  Borrower will pay to Bank its reasonable fees, costs and expenses (including, without limitation, reasonable attorneys' fees, other professionals' fees, appraisal fees, environmental assessment fees (including Phase I and Phase II assessments), expert fees, court costs, litigation and other expenses (collectively, "Costs") incurred or paid by Bank in connection with negotiating, documenting, administering and enforcing the Revolving Facility, the Loans and the Loan Documents, and the defense, preservation and protection of Bank's rights and remedies thereunder, including without limitation, its security interest in the Collateral or any other property pledged to secure the Loans, whether incurred in bankruptcy, insolvency, foreclosure or other litigation or proceedings or otherwise.  Borrower has the right to request and receive from Bank a detailed accounting of all such Costs before being obligated to pay them.  If Borrower fails to pay the Costs when due, Bank is entitled to disburse such sums as an advance under the Revolving Facility.  This provision will survive the termination of this Agreement and/or the repayment of any amounts due or the performance of any Obligation.

4.13    Further Assurances.  Borrower shall provide such additional documents, and perform such additional acts, as the Bank may reasonably deem necessary to effectively carry out the purposes of,

8

or to confirm this Agreement and the other Loan Documents, or to enable the Bank to enforce any of its rights hereunder or thereunder

Section 5.     Negative Covenants.  The Borrower covenants and agrees that from the Effective Date until all Obligations have been paid in full and any commitments of the Bank to the Borrower have been terminated, Borrower will not, without the Bank's prior written consent:

5.1     Indebtedness    Borrower will not incur, create, assume or permit to exist any Indebtedness other than the Indebtedness evidenced by this Agreement and any other Obligations to Bank.

5.2     Prepayments.  Borrower will not voluntarily prepay any Indebtedness owing by Borrower prior to the stated maturity date thereof, other than the Obligations.

5.3     Leases.  Borrower will not enter into any operating lease of real or personal property as lessee, other than operating leases in existence on the Effective Date and leases with annual payments not to exceed $100,000.

5.4     Capital Expenditures.  Borrower will not make any Unfunded Capital Expenditures in excess of $150,000 in the aggregate  in any one fiscal year  Unfunded Capital Expenditures shall not include expenditures for the repair or replacement of damaged equipment made from the Insurance Proceeds.

5.5     Pledge or Encumbrance of Assets.  Borrower will not create, incur, assume or permit to exist, arise or attach any Lien in any present or future asset, except for Permitted Liens.

5.6     Guarantees and Loans.  Borrower will not enter into any direct or indirect guarantees other than by endorsement of checks for deposit in the ordinary course of business or make any advance or loan other than loans and advances to employees of Borrower in the ordinary course of business.

5.7     Equity; Distributions. Borrower will not (a) redeem any membership interests, or (b) declare or pay any distributions on its membership interests; provided, however, that:

(i)     the Borrower may make distributions to its members in an amount equal to the federal and state income tax of such members attributable to the earnings of the Borrower;

(ii)    the Borrower may make additional distributions of $200,000.00 per year to cover Guarantor's compensation; and

(iii)   **as long as no Event of Default exists and is continuing**, the Borrower may make special distributions to Guarantor from the Insurance Proceeds ("Special Distributions") subject to the following conditions:

(a)     as of the Effective Date, the Borrower must establish Insurance Proceeds in the amount of $1,400,000.00 in cash in the Borrower, of which $400,000 was used to repay PNC Bank, and maintain this $1,400,000 in accordance with Section 5.12 (the "Equity Requirement");

(b)     the Borrower must maintain Insurance Proceeds in an amount necessary to pay the maximum estimated potential tax liability of Guarantor related to the receipt of the Insurance Proceeds (the "Tax Distributions")  Prior to the Effective Date, Borrower shall

9

provide to Bank a reasonable estimate prepared by an independent certified public accountant of the maximum expected amount of the required Tax Distributions. The amount of the estimated Tax Distributions must be (i) maintained in a restricted account at the Bank or (ii) reserved under the Borrowing Base, until the Borrower delivers to Bank an estimate of the required Tax Distributions prepared by Borrower's independent certified accountants. Regarding the Section 5.7(iii)(b)(ii) reserve, the Borrower will update, from time to time, estimate of tax liability and make appropriate reserve adjustments, subject to the Bank's approval, which will not be unreasonably withheld. Thereafter, the Tax Distributions may be made to Guarantor for taxes due; provided, however, that the Tax Distributions must be held in a restricted account at Bank in the name of Guarantor until such time as the taxes are actually paid by Guarantor.

(c)     subject to satisfaction of the foregoing conditions, the Borrower may make Special Distributions in an amount not in excess of $250,000 in the aggregate without the Bank's prior written consent;

(d)     subject to satisfaction of the foregoing conditions, the Borrower may make Special Distributions in an amount in excess of $250,000 in the aggregate upon satisfaction of the following additional conditions:

(1)     the Bank has received the Borrower's Compliance Certificate in accordance with Section 4.2(d) and the December 31, 2010 Reviewed financial statement in accordance with Section 4.2(c), demonstrating compliance with the financial reporting and covenants set forth in this Agreement;

(2)     one of the following conditions has been met:

(i) the Borrower has been released from the guaranty of B4C; or

(ii) a $300,000 reserve has been established under the Borrowing Base until such B4C guaranty has been released; or

(iii) $300,000 maintained in the Guarantors name in a restricted account with the Bank until such B4C guaranty has been released; and

(3)     the Borrower has a minimum average Unused Availability of $400,000 under the Revolving Facility for the 90 day period preceding the date of the Special Distribution (excluding the amount of the Special Distribution)

5.8     Merger or Purchase of Assets; Disposition of Assets  Borrower will not (a) change its capital structure; (b) merge or consolidate with any Person, including but not limited to Affiliates; (c) amend or change its organizational documents; (d) sell, transfer, lease, or otherwise dispose of (whether in one transaction or in a series of transactions) all or any substantial part of its assets, whether now owned or hereafter acquired, except for sales of Inventory and dispositions of obsolete Equipment in the ordinary course of business; (e) purchase or acquire any assets from any Person, other than in the ordinary course of business; or (f) dissolve, liquidate, reorganize, or adopt a plan of exchange as to its equity interests or permit itself to be the subject of an acquisition.

5.9      Transactions with Affiliates.  Borrower will not:

(a)      make any payments of any kind to its members or Affiliates (including, without limitation, debt repayments, payments for goods or services or otherwise), other than:

(i)  ordinary salary payments, sales commissions and expense reimbursements to Affiliates employed by Borrower,

(ii) payments permitted by Section 5.7, and

*77,926.19*

(iii) a payment in the amount of ~~$81,585.96~~ representing principal owed on a mortgage note for property located at 100 Holiday Dr , Englewood, Ohio 45322;

(b)      directly or indirectly issue any guarantee for the benefit of any of its Affiliates;

(c)      directly or indirectly make any loans or advances to or investments in any of its Affiliates;

(d)      enter into any transaction with any of its Affiliates, other than transactions entered into on an arm's length basis in the ordinary course of Borrower's business; or

(e)      divert (or permit anyone to divert) any of its business opportunities to any Affiliate or any other corporate or business entity in which Borrower or its Affiliates holds a direct or indirect interest.

5.10     Investments.  Borrower will not purchase or hold beneficially any stock, securities or evidences of Indebtedness of, or make any investment or acquire any interest in, any other firm, partnership, corporation or entity other than short term investments of excess working capital in one or more of the following: (a) investments (of one year or less) in direct or guaranteed obligations of the United States, or any agencies thereof or in mutual funds which invest exclusively in such obligations; and (b) investments (of one year or less) in certificates of deposit of banks or trust companies organized under the laws of the United States or any jurisdiction thereof, provided that such banks or trust companies are insured by the Federal Deposit Insurance Corporation and have capital in excess of $25,000,000.

5.11     Fixed Charge Coverage Ratio  Borrower will not permit its combined ratio of (i) EBITDA plus rent and operating lease payments, less (a) Permitted Distributions (including but not limited to Tax Distributions), (b) cash taxes paid, (c) Unfunded Capital Expenditures and (d) other extraordinary items excluding expenditures related to the Insurance Proceeds to (ii) the sum of scheduled principal and interest payments plus actual rent and operating lease expense, to be less than 1 20 to 1 at the end of each fiscal quarter, beginning with the fiscal quarter ending December 31, 2010, on a trailing twelve month basis  For the period of December 31, 2010 through September 30, 2011, principal and interest will be calculated on an annualized basis using the amounts owed under this Agreement.

5.12     Minimum Tangible Net Worth.  Borrower will not permit its combined Tangible Net Worth to be less than the following at the end of any fiscal quarter: (i) $2,000,000 plus (ii) the amount of the gain recorded in accordance with GAAP on the Equity Requirement, beginning with the fiscal quarter ending December 31, 2010

5.13     Business and Accounting Changes  Borrower will not do any of the following, unless prior thereto, such Borrower has given the Bank not less than thirty (30) days prior written notice thereof

and the Bank has consented thereto: (i) change its name as it appears in official filings in the state of its organization or the name under or by which it conducts its business, (ii) directly or indirectly engage in any business which would represent a material change from the business presently being conducted by it, (iii) discontinue any material part of the business presently being conducted by it, (iv) make any significant change in accounting treatment or reporting practices, except as required by GAAP, (v) change its fiscal year, (vi) change its chief executive office, principal place of business, mailing address, corporate offices or warehouses or locations at which Collateral is held or stored, or the location of its records concerning the Collateral, (vii) change the type of entity that it is, (viii) change its organization identification number, if any, issued by its state of incorporation, or (ix) change its state of organization.

      5.14    <u>Off-Balance Sheet Liabilities; Sale and Leaseback Transactions</u>  The Borrower shall not have any off-balance sheet liabilities or engage in any sale and leaseback transactions.

## Section 6.    Events of Default and Remedies

      6.1    <u>Events of Default</u>  Any of the following events will be an Event of Default ("Event of Default"):

    (a)    any representation or warranty made by Borrower herein or in any of the Loan Documents is not correct in any material respect when made or reaffirmed; or

    (b)    any default in the payment of any principal or interest or other monetary amount on any Obligation when due and payable, whether by acceleration or otherwise; or

    (c)    Borrower fails to observe or perform any covenant, condition or agreement herein or in any Loan Document and fails to cure such default within 30 days of the occurrence thereof, provided that such 30 day grace period will not apply to (i) a breach of any covenant which in Bank's good faith judgment is incapable of cure, (ii) any failure to maintain insurance or permit inspection of the Collateral or of the books and records of Borrower in accordance with this Agreement or (iii) any breach in any negative covenant set forth in <u>Section 5</u> hereof; or

    (d)    a court enters a decree or order for relief with respect to Borrower or Guarantor in an involuntary case under any applicable bankruptcy, insolvency or other similar law then in effect, or appoints a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of Borrower or Guarantor or for any substantial part of their property, or orders the wind-up or liquidation of their affairs; or a petition initiating an involuntary case under any such bankruptcy, insolvency or similar law is filed and is pending for sixty (60) days without dismissal; or

    (e)    Borrower or Guarantor commences a voluntary case under any applicable bankruptcy, insolvency or other similar law in effect, or makes any general assignment for the benefit of creditors, or fails generally to pay its debts as such debts become due, or dissolves, or takes action in furtherance of any of the foregoing; or

    (f)    Borrower or Guarantor defaults under the terms of any Indebtedness (other than the Obligations) with a principal amount or amount payable on termination, as applicable, in excess of $175,000.00, and such default gives any creditor or lessor the right to accelerate the maturity of any such Indebtedness; or

(g)     a default or event of default occurs under any Indebtedness of Borrower or Guarantor to the Bank or any Bank Affiliate or under any other Loan Document; or

(h)     final judgment for the payment of money is rendered against Borrower or Guarantor in excess of $175,000 00, and remains undischarged for 10 days during which execution is not effectively stayed; or

(i)     any event occurs which might, in Bank's opinion, have a Material Adverse Effect; or

(j)     a Change in Control occurs; or

(k)     the commencement of any foreclosure proceedings, proceedings in aid of execution, attachment actions, levies against, or the filing by any taxing authority of a lien against any of the Collateral or any property securing the repayment of any of the Obligations; or

(l)     the loss, theft or substantial damage to the Collateral or any property securing the repayment of the Obligations if the result of such occurrence will be, in Bank's reasonable judgment, the failure or inability of Borrower to continue substantially normal operation of its business within thirty (30) days of the date of such occurrence, unless Borrower has business interruption insurance reasonably satisfactory to Bank; or

(m)     (i) the validity or effectiveness of any of the Loan Documents or its transfer, grant, pledge, mortgage, or assignment by the party executing such Loan Document is impaired; (ii) any party executing any of the Loan Documents asserts that any of such Loan Documents is not a legal, valid and binding obligation of the party thereto enforceable in accordance with its terms; (iii) the security interest or Lien purporting to be created by any of the Loan Documents will for any reason cease to be a valid, perfected first priority lien subject to no other liens other than Permitted Liens; or (iv) any Loan Document is amended, hypothecated, subordinated, terminated or discharged, or if any person is released from any of its covenants or obligations under any of the Loan Documents except as permitted by Bank in writing; or

(n)     a Reportable Event (as defined in ERISA) occurs with respect to any employee benefit plan maintained by Borrower for its employees other than a Reportable Event caused solely by a decrease in employment; or a trustee is appointed by a United States District Court to administer any employee benefit plan; or the Pension Benefit Guaranty Corporation institutes proceedings to terminate any of Borrower's employee benefit plans; or

(o)     the filing of any lien or charge against the Collateral or any part thereof which is not removed to the satisfaction of Bank within a period of 30 days thereafter; or

(p)     nonpayment by Borrower of any Rate Management Obligation when due or the breach by the Borrower of any term, provision or condition contained in any Rate Management Agreement

        6 2     Remedies  If any Event of Default occurs, Bank may, in its sole discretion, (i) cease advancing money hereunder, (ii) declare all Obligations to be immediately due and payable, whereupon such Obligations will immediately become due and payable, (iii) exercise any and all rights and remedies provided by applicable law and the Loan Documents, (iv) proceed to realize upon the Collateral or any property securing the Obligations, including, without limitation, causing all or any part of the Collateral

to be transferred or registered in its name or in the name of any other person, firm or corporation, with or without designation of the capacity of such nominee, all without presentment, demand, protest, or notice of any kind, each of which are hereby expressly waived by Borrower   Borrower shall be liable for any deficiency remaining after disposition of any Collateral

6.3     Setoff   If an Event of Default occurs, Bank is authorized, without notice to Borrower, to offset and apply to all or any part of the Obligations all moneys, credits and other property of any nature whatsoever of Borrower now or at any time hereafter in the possession of, in transit to or from, under the control or custody of, or on deposit with Bank (whether held by Borrower individually or jointly with another party), including but not limited to certificates of deposit excluding, however, all IRA, Keogh, and trust accounts.

6.4     Default Rate   After an Event of Default, all amounts of principal outstanding as of the date of such Event of Default will accrue interest at the Default Rate, in Bank's sole discretion, upon notice to Borrower   This provision does not constitute a waiver of any Event of Default or an agreement by Bank to permit any late payments whatsoever

6.5     Late Payment Penalty    If any payment of principal is not paid when due (whether at maturity, by acceleration or otherwise after the expiration of any applicable notice, grace and cure periods), or within ten (10) days thereafter, Borrower agrees to pay to Bank a late payment fee equal to five percent (5%) of the payment amount then due.

6.6     No Remedy Exclusive   No remedy set forth herein is exclusive of any other available remedy or remedies, but each is cumulative and in addition to every other remedy available under this Agreement, the Loan Documents or as may be now or hereafter existing at law or in equity.  Borrower waives any requirement of marshaling of assets.

6.7     Effect of Termination.  The termination of this Agreement will not affect any rights of either party or any obligation of either party to the other, arising prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights created or Obligations incurred prior to such termination have been fully disposed of, concluded or liquidated   The security interest, lien and rights granted to Bank hereunder and under the Loan Documents will continue in full force and effect, notwithstanding the termination of this Agreement or the fact that no Loans are outstanding to Borrower, until all of the Obligations have been paid in full

Section 7     Conditions Precedent.

7.1     Conditions to Initial Loans   Bank will have no obligation to make or advance any Loans until Borrower has delivered to Bank or established to Bank's satisfaction, or Bank has received, at or before the Effective Date, in form and substance satisfactory to Bank:

(a)     Executed Loan Documents.

(b)     A Certificate of each Borrower certifying the Borrower's organizational documents and resolutions authorizing the Loans

(c)     A favorable opinion of counsel to Borrower.

(d)     All appropriate UCC financing statements.

(e)      UCC searches, tax lien and litigation searches, insurance certificates, notices or other documents which Bank may require to reflect, perfect or protect Bank's first priority lien in the Collateral and all other property pledged to secure the Obligations and to fully consummate this transaction.

(f)      All requisite releases of liens, termination statements and satisfactions of mortgages necessary to release all liens and encumbrances against the Collateral and any other property pledged to secure the Loans

(g)      All requisite landlord lien waivers and collateral control agreements, to be executed and delivered by Borrower's landlords and bailors which are necessary to grant Bank a first lien in the Collateral;

(h)      Borrower has paid a note processing fee of $500 for each of the Revolving Note and the Term Note, and all of Bank's out of pocket expenses incurred in connection with the preparation of this Agreement and accompanying documents and the consummation of the transactions contemplated hereby

(i)      A Certificate of Insurance as described in <u>Section 4.4</u> hereof.

(j)      Bank shall have completed to its reasonable satisfaction an audit of the books and records of Borrower, including the Collateral It is understood, however, that any such audit by Bank will in no respect waive Bank's rights to pursue remedies upon an Event of Default.

(k)      Such additional information and materials as Bank may reasonably request

7.2      <u>Conditions to Each Revolving Loan</u>. On the date of each Revolving Loan, the following statements will be true:

(a)      All of the representations and warranties contained herein and in the Loan Documents will be correct in all material respects as though made on such date;

(b)      No event will have occurred and be continuing, or would result from such Revolving Loan, which constitutes a Default or an Event of Default;

(c)      The aggregate unpaid principal amount of the Revolving Loans after giving effect to such Revolving Loan will not exceed the Maximum Amount.

The acceptance by Borrower of the proceeds of each Revolving Loan will be deemed to constitute a representation and warranty by Borrower that the conditions in this <u>Section 7.2</u> have been satisfied.

Section 8.      <u>Miscellaneous Provisions</u>

8.1      <u>Miscellaneous</u>. This Agreement, the Exhibits and the other Loan Documents are the complete agreement of the parties hereto and supersede all previous understandings relating to the subject matter hereof This Agreement may be amended only in a writing signed by the party against whom enforcement of the amendment is sought. This Agreement may be executed in counterparts. If any part of this Agreement is held invalid, illegal or unenforceable, the remainder of this Agreement will not in any way be affected This Agreement is and is intended to be a continuing agreement and will remain in

full force and effect until the Loans are finally and irrevocably paid in full and the Revolving Facility is terminated

8.2     Waiver by Borrower. Borrower waives notice of non-payment, demand, presentment, protest or notice of protest of any Accounts or other Collateral, and all other notices (except those notices specifically provided for in this Agreement); consents to any renewals or extensions of time of payment thereof. Borrower hereby waives all defenses based upon suretyship or impairment of collateral, including but not limited to all defenses set forth in Section 3-605 of the UCC. Such waivers are entered into to the full extent permitted by Section 3-605(i) of the UCC.

8.3     Binding Effect. This Agreement will be binding upon and inure to the benefit of the respective legal representatives, successors and assigns of the parties hereto; provided, however, that Borrower may not assign or transfer any of its rights or delegate any of its Obligations under this Agreement or any of the Loan Documents, by operation of law or otherwise. Bank (and any subsequent assignee) may transfer and assign any of its rights or delegate any of its duties under this Agreement or may transfer or assign partial interests or participation in the Loans to other Persons. Bank may disclose to all prospective and actual assignees and participants all financial, business and other information about Borrower which Bank may possess at any time.

8.4     Joint and Several Liability; Subsidiaries. If there is more than one Borrower, their liability will be joint and several. If Borrower has any additional Subsidiaries at any time during the term of this Agreement, the term "Borrower" in each representation, warranty and covenant herein will mean Borrower and each Subsidiary individually and in the aggregate, and Borrower will cause each Subsidiary to be in compliance therewith.

8.5     Security. The Obligations are secured as provided herein and in the Loan Documents and each other document or agreement which by its terms secures the repayment or performance of the Obligations.

8.6     Survival. All representations, warranties, covenants and agreements made by Borrower herein and in the Loan Documents will survive the execution and delivery of this Agreement and the Loan Documents.

8.7     Delay or Omission. No delay or omission on the part of Bank in exercising any right, remedy or power arising from any Event of Default will impair any such right, remedy or power or any other right remedy or power or be considered a waiver or any right, remedy or power or any Event of Default nor will the action or omission to act by Bank upon the occurrence of any Event of Default impair any right, remedy or power arising as a result thereof or affect any subsequent Event of Default of the same or different nature.

8.8     Notices. Any notices under or pursuant to this Agreement will be deemed duly sent when delivered in hand or when mailed by registered or certified mail, return receipt requested, addressed as follows:

                To Borrower:        Liteflex LLC
                                    Brandt Manufacturing LLC
                                    100 Holiday Drive
                                    Englewood, Ohio 45322

                To Bank:            Fifth Third Bank
                                    1 South Main Street

Dayton, Ohio 45402
Attention: Dan Erlandson

With a copy to:        Fern Goldman, Esq.
                       Statman, Harris & Eyrich, LLC
                       3700 Carew Tower
                       441 Vine Street
                       Cincinnati, Ohio  45202

Either party may change such address by sending written notice of the change to the other party.

8.9     No Partnership.  Nothing contained herein or in any of the Loan Documents is intended to create or will be construed to create any partnership, joint venture or other relationship between Bank and Borrower other than as expressly set forth herein or therein and will not create any joint venture, partnership or other relationship.

8.10     Indemnification.  If after receipt of any payment of all or part of the Obligations, Bank is for any reason compelled to surrender such payment to any person or entity, because such payment is determined to be void or voidable as a preference, impermissible setoff, or diversion of trust funds, or for any other reason, this Agreement will continue in full force and effect and Borrower will be liable to, and will indemnify, save and hold Bank, its officers, directors, attorneys, and employees harmless of and from the amount of such payment surrendered.  The provisions of this Section will be and remain effective notwithstanding any contrary action which may have been taken by Bank in reliance on such payment, and any such contrary action so taken will be without prejudice to Bank's rights under this Agreement and will be deemed to have been conditioned upon such payment becoming final, indefeasible and irrevocable.  In addition, Borrower will indemnify, defend, save and hold Bank, its officers, directors, attorneys, and employees harmless of, from and against all claims, demands, liabilities, judgments, losses, damages, costs and expenses, joint or several (including all accounting fees and attorneys' fees reasonably incurred), that Bank or any such indemnified party may incur arising out of this Agreement, any of the Loan Documents or any act taken by Bank hereunder except for the willful misconduct or gross negligence of such indemnified party.  The provisions of this Section will survive the termination of this Agreement.

8.11     Governing Law; Jurisdiction.  This Agreement, the Note and the other Loan Documents will be governed by the domestic laws of the State of Ohio.  Borrower agrees that the state and federal courts in Montgomery County, Ohio, have exclusive jurisdiction over all matters arising out of this Agreement and the other Loan Documents, and that service of process in any such proceeding will be effective if mailed to Borrower at its address described in the Notices section of this Agreement; provided that nothing contained in this Agreement or the other Loan Documents will prevent Bank from bringing any action to enforce any award or judgment or exercise any rights against Borrower, against any security or against any property of Borrower within any other county, state or other foreign or domestic jurisdiction.  **BANK AND BORROWER HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

Executed as of the Effective Date.

LITEFLEX LLC

By: _____
　　　John Prikkel, III
　　　Sole Member and Manager

BRANDT MANUFACTURING LLC

By: _____
　　　John Prikkel, III
　　　Sole Member and Manager

FIFTH THIRD BANK

By: _____
　　　Daniel Erlandson, Vice President

**EXHIBITS AND SCHEDULES**
**TO**
**CREDIT AGREEMENT**
**BETWEEN**
**LITEFLEX LLC,**

**BRANDT MANUFACTURING LLC**
**And**

**FIFTH THIRD BANK**

Exhibit 1 – Definitions

| | |
|---|---|
| Schedule 3.1 | - Prior Names, Entities |
| Schedule 3.6 | - Intellectual Property |
| Schedule 3.12 | - Subsidiaries |
| Schedule 3.14 | - Ownership and Management |
| Schedule 3.15 | - Property Locations owned and/or leased |
| Schedule 3.15 | - Chief executive office and operating locations |
| Schedule 5.1 | - Permitted Indebtedness on Effective Date |
| Schedule 5.5 | - Permitted Liens on Effective Date |

## EXHIBIT 1

## DEFINITIONS

In addition to words and terms defined elsewhere in this Agreement, the following words and terms shall have the following meanings:

"Affiliate" means, as to Borrower, (a) any person or entity which, directly or indirectly, is in control of, is controlled by or is under common control with, Borrower, or (b) any person who is a director, officer or employee (i) of Borrower or (ii) of any person described in the preceding clause (a). For purposes of this definition, control of a person shall mean (a) the power, direct or indirect, (i) to vote ten percent (10%) or more of the securities, partnership interests or membership interests having ordinary voting power for the election of directors of such person or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise or (b) the ownership, direct or indirect, of ten percent (10%) or more of any class of equity securities of such person.

"Bank Affiliate" means every entity of which Fifth Third Bancorp is the majority owner.

"Borrowing Base" means the sum of (i) **80%** of the aggregate amount of Eligible Accounts plus (ii) **40%** of the aggregate amount of Eligible Inventory.

"Business Day" means any day on which U.S. Federal Reserve Bank is open in Cincinnati, Ohio for the transaction of its normal business, and if the applicable day relates to LIBOR matters, a day on which dealings in U.S. Dollar deposits are also carried on in the London interbank market and banks are open for business in London.

"Change in Control" means (a) the acquisition of ownership, directly or indirectly of the Borrower's equity interests by parties other than those parties owning such equity interests on the Effective Date or (b) the acquisition of the power to direct or cause the direction of the management or policies of the Borrower, whether through the ability to exercise voting power, by contract or otherwise, by parties other those parties controlling the Borrower on the Effective Date.

"Collateral" shall have the meaning set forth in the Security Agreements.

"Debtors" means Borrower's customers and all other persons who are obligated or indebted to Borrower in any manner, whether directly or indirectly, primarily or secondarily, contingently or otherwise, with respect to Accounts, General Intangibles or Payment Intangibles.

"Default" means an event which with notice or lapse of time would constitute an Event of Default.

"Default Rate" means three percent (3%) in excess of the interest rate otherwise in effect under amounts outstanding under the Notes. In no event will the interest rate accruing under such Notes be increased to be in excess of the maximum interest rate permitted by applicable state or federal usury laws then in effect.

"EBITDA" means net income before interest expense, taxes, depreciation, and amortization.

"Eligible Accounts" means Borrower's accounts which have been validly assigned to Bank and strictly comply with all of Borrower's warranties and representations to Bank; but Eligible Accounts will <u>not</u> include the following: (a) Accounts which are due and have not been paid within **sixty (60)**

days of the invoice date; (b) Accounts with respect to which the Debtor is the United States or any department, agency or instrumentality of the United States unless Borrower has assigned its interests in such Accounts to Bank pursuant to Federal Assignment of Claims Act or Bank has expressly waived that requirement with respect to specific receivables; (c) Accounts with respect to which the Debtor is any State of the United States or any city, town municipality or division thereof, unless Borrower has established to Bank's satisfaction that Bank will have a perfected security interest in such Accounts; (d) Accounts with respect to which the Debtor is an Affiliate of Borrower; (e) any Accounts of a particular Debtor if Borrower is or may become liable to that Debtor for goods sold or services rendered (including but not limited to commissions or accounts payable or accrued liabilities due to such Debtor) by that Debtor to such Borrower; (f) any Accounts owed by a particular Debtor when **25%** or more of the total Accounts of such Debtor are unpaid more than **sixty (60)** days from the invoice date; (g) any Accounts owed by any Debtor which has filed or has had filed against it a petition for bankruptcy, insolvency, receivership, reorganization or any other type of relief under insolvency laws, or is the subject of any business failure, termination of existence or dissolution, winding up or liquidation proceeding, has admitted in writing its inability, or is generally unable to, pay its debts as they become due, or becomes insolvent or has made an assignment for the benefit of creditors; (h) any deposits, reserves or accrued rebates; (i) any Accounts as to which Borrower's title is not absolute or which are subject to any Lien (other than Permitted Liens that do not have priority over the Lien in favor of the Bank); (j) any Accounts from a Debtor located in a state which requires a foreign entity to qualify to do business or file a business activities report or similar report prior to doing business in such state (and will not permit Borrower to seek judicial enforcement in such state of payment of any such Accounts unless such requirement has been met), unless Borrower has duly qualified to do business as a foreign corporation in such state or filed a business activities report with the appropriate office in such state for the then current year; (k) any Accounts that are owed in any currency other than U S dollars or are payable outside the United States (other than Canada) unless payment of such Account has been secured by a letter of credit issued to Borrower in the amount of such Account, (l) any Account that arose out of a contract for which Borrower has provided a performance or other bond; (m) any Account that did not arise from either an outright bona fide sale (on an absolute basis and not on a consignment, approval, sale and return, guaranteed sale, progress billing, retainage or bill-and-hold basis) of goods or the performance of services under an enforceable contract by Borrower; (n) any Account for which the goods giving rise to such Account have not been shipped to the Debtor or for which the services giving rise to such Account have not been performed by Borrower, (o) any Account for which Borrower has received any note, trade acceptance, draft or other instrument with respect to or in payment of such Account, or any chattel paper which respect to the goods giving rise to such Account; (p) any Account that is subject to any guaranteed sale arrangements or any claim of reduction, counterclaim, set-off, recoupment, contra, holdback, credit, allowance or adjustment by the Debtor; or (q) any Accounts owed by a Debtor who does not meet Bank's standards of creditworthiness, in Bank's sole credit judgment exercised in good faith   An Account which is deemed to be an Eligible Account, but which subsequently fails to meet the foregoing criteria for an Eligible Account, shall immediately cease to be an Eligible Account for the purpose of determining the total amount of Revolving Loans that may be made to Borrower hereunder   The Bank may create and maintain reserves against eligibility from time to time based on such credit and collateral considerations as the Bank may deem appropriate, including consideration of Bank's operational or credit equivalent exposure to the Borrower

"Eligible Inventory" means Inventory owned by the Borrower of raw materials and finished goods valued at the lower of cost or fair market value on a first in, first out basis, in accordance with GAAP, and excluding (a) slow moving Inventory (Inventory which has not been sold within twenty-four (24) months in the case of finished goods and components and twelve (12) months in the case of raw materials), obsolete or unsalable items, work in process, spare parts and packaging and supplies, (b) Inventory located outside the continental United States, (c) any Inventory not in the actual possession

of the Borrower, unless the Borrower obtains an executed landlord or bailor/bailee waiver in a form acceptable to Bank from the landlord/bailee for the location of such Inventory, (d) any Inventory subject to a Lien (other than Permitted Liens that do not have priority over the Lien in favor of the Bank), (e) any Inventory subject to a Lien or claim of title of a government authority under 32 C F R Section 7-104 35(b)/FAR 52 232.16, (f) goods held on consignment, (g) Inventory which is not reflected in a current perpetual inventory report of Borrower, and (h) other Inventory deemed ineligible by Bank based on such credit and collateral considerations as Bank may deem appropriate. Inventory which is deemed to be Eligible Inventory, but which subsequently fails to meet the foregoing criteria for Eligible Inventory, shall immediately cease to be Eligible Inventory for the purpose of determining the total amount of Revolving Loans that may be made to Borrower hereunder The Bank may create and maintain reserves against eligibility from time to time based on such credit and collateral considerations as the Bank may deem appropriate, including consideration of Bank's operational or credit equivalent exposure to the Borrower.

"Environmental Laws" means all federal, state, local and foreign laws relating to pollution or protection of the environment, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial toxic or hazardous substances or wastes into the environment (including without limitation ambient air, surface water, ground water or land), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes, and any and all regulations, codes, plans, orders, decrees, judgments, injunctions, notices or demand letters issued, entered promulgated or approved thereunder.

"ERISA" means the Federal Employee Retirement Income Security Act of 1974

"Event(s) of Default" shall have the meaning set forth in Section 6.1.

"Ex Im Loan Termination Date" means the termination date of the revolving line of credit provided by Bank to Borrower pursuant to the Export-Import Bank of the United States Working Capital Guarantee Program.

"GAAP" means generally accepted accounting principles consistently applied.

"Guaranty" means the Continuing Guaranty Agreement of the Guarantor for Obligations of Borrower to Bank.

"Guarantor" means John Prikkel

"Indebtedness" means (a) any and all indebtedness, obligations or liabilities (whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several) for or in respect of: (i) borrowed money, (ii) amounts raised under or liabilities in respect of any note purchase or acceptance credit facility, (iii) reimbursement obligations (contingent or otherwise) under any letter of credit, currency swap agreement, interest rate swap, cap, collar or floor agreement or other interest rate management device, (iv) any other transaction (including forward sale or purchase agreements, capitalized leases and conditional sales agreements) having the commercial effect of a borrowing of money to finance operations or capital requirements (but not including trade payables and accrued expenses incurred in the ordinary course of business which are not represented by a promissory note or other evidence of indebtedness and which are not more than thirty (30) days past due), or (b) any guaranty by Borrower of Indebtedness of others.

"Insurance Proceeds" means the net insurance proceeds received by Borrower related to a flood at its Maywood Ave. plant.

"Interest Rate Event" means (i) if any change in any law, regulation or official directive, or in the interpretation thereof, by any governmental body charged with the administration thereof, shall make it unlawful for Bank to find or maintain its funding in Eurodollars of any portion of a Loan subject to the LIBOR Rate or otherwise to give effect to Bank's obligations as contemplated thereby: (A) Bank may, by written notice to Borrower, declare Bank's obligations in respect of the LIBOR Rate to be terminated forthwith, and (B) the LIBOR Rate with respect to Bank shall forthwith cease to be in effect, or (ii) if Bank, by telephonic notice, shall notify Borrower that one month LIBOR deposits are not readily available in the London Inter-Bank Offered Rate Market, or that, by reason of circumstances affecting such Market, adequate and reasonable methods do not exist for ascertaining the rate of interest applicable to such deposits.

"LIBOR Rate" means the rate (adjusted for reserves if Bank is required to maintain reserves with respect to relevant advances (rounded upwards, if necessary, to the next 1/8th of 1.00%) and adjusted for reserves if Bank is required to maintain reserves with respect to relevant advances, fixed by the British Bankers' Association at 11:00 a.m., London time, relating to quotations for the one month London InterBank Offered Rates on U.S. Dollar deposits as published on Bloomberg LP, or, if no longer provided by Bloomberg LP, such rate as shall be determined in good faith by the Bank from such sources as it shall determine to be comparable to Bloomberg LP (or any successor) as determined by Bank at approximately 10:00 a.m. Cincinnati, Ohio time on the relevant date of determination. The LIBOR Rate will not be rounded as to any portion of any Loan that is subject to a Rate Management Agreement. The LIBOR Rate shall initially be determined as of the date of the initial advance of funds to Borrower under the Note and shall be effective until the first (1st) Business Day of the month following the initial advance. The LIBOR Rate shall be adjusted automatically on the first (1st) Business Day of each one month period thereafter, commencing on the first (1st) Business Day of the month following the expiration of the initial LIBOR Rate determination under each Note.

"Lien" means any security interest, mortgage, pledge, assignment, lien or other encumbrance of any kind, including interests of vendors or lessors under conditional sale contracts and capitalized leases.

"Liquidity Requirement" has the meaning given in Section 5.7.

"Loan Documents" means this Agreement, the Note, the Security Agreements, the Guaranty, any and all Rate Management Agreements, and every other document or agreement executed by any party in connection with this Agreement or the transactions contemplated hereby, or evidencing, guarantying or securing any of the Obligations; and "Loan Document" means any one of the Loan Documents.

"Loans" means the Revolving Loans and the Term Loan.

"Material" means a value, claim or outcome in the amount of $175,000.00 or more.

"Material Adverse Effect" means a material adverse effect on (i) the business, assets, operations, financial condition or prospects of Borrower taken as a whole or (ii) the ability of Borrower to pay the Obligations and perform its obligations under this Agreement or (iii) the ability of Bank to enforce any of its rights or to collect any of the Obligations then due and payable.

"Maximum Amount" shall have the meaning set forth in Section 2.1(a).

"Notes" means the Revolving Note and the Term Note

"Obligation(s)" means all loans, advances, indebtedness, liabilities and obligations of Borrower owed to Bank and any Bank Affiliate of every kind and description whether now existing or hereafter arising including without limitation, those owed by Borrower to others and acquired by Bank or any Bank Affiliate, by purchase, assignment or otherwise, and whether direct or indirect, primary or as guarantor or surety, absolute or contingent, liquidated or unliquidated, matured or unmatured, whether or not secured by additional collateral, and including without limitation all liabilities, obligations and indebtedness arising under this Agreement, the Note and the other Loan Documents, any and all Rate Management Obligations, all obligations to perform or forbear from performing acts, all amounts represented by letters of credit now or hereafter issued by Bank for the benefit of or at the request of Borrower, and all expenses and attorneys' fees incurred by Bank and any Bank Affiliate under this Agreement or any other document or instrument related to any of the foregoing

"Permitted Distributions" means distributions to Guarantor permitted by Section 5 7

"Permitted Liens" means (i) Liens to Bank, (ii) Liens existing on the Effective Date which have been disclosed in writing to and approved by Bank, and (iii) Liens imposed by law which secure amounts not yet due and payable

"Person" means any individual, firm, partnership, joint venture, corporation, association, business enterprise, trust, governmental body or other entity, whether acting in an individual, fiduciary, or other capacity.

"Prime Rate" means the floating rate of interest per annum announced to be its prime rate from time to time by Bank at its principal office in Cincinnati, Ohio whether or not Bank will at times lend to borrowers at lower rates of interest or, if there is no such prime rate, then its base rate or such other rate as may be substituted by Bank for the prime rate. In the event of a change in the Prime Rate, the interest rate on the Note shall be changed immediately to the new Prime Rate.

"Principal Financial Officer" means the president, chief financial officer or treasurer of the Borrower

"Rate Management Agreement" means any agreement, device or arrangement providing for payments which are related to fluctuations of interest rates, exchange rates, forward rates, or equity prices, including, but not limited to, dollar-denominated or cross-currency interest rate exchange agreements, forward currency exchange agreements, interest rate cap or collar protection agreements, forward rate currency or interest rate options, puts and warrants, and any agreement pertaining to equity derivative transactions (e g , equity or equity index swaps, options, caps, floors, collars and forwards), including without limitation any ISDA Master Agreement between Borrower and Bank or any affiliate of Fifth Third Bancorp, and any schedules, confirmations and documents and other confirming evidence between the parties confirming transactions thereunder, all whether now existing or hereafter arising, and in each case as amended, modified or supplemented from time to time

"Rate Management Obligations" means any and all obligations of Borrower to Bank or any affiliate of Fifth Third Bancorp, whether absolute, contingent or otherwise and howsoever and whensoever (whether now or hereafter) created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under or in connection with (i) any and all Rate Management Agreements, and (ii) any and all cancellations, buy-backs, reversals, terminations or assignments of any Rate Management Agreement.

"Revolving Credit Commitment" means One Million Dollars ($1,000,000).

"Revolving Facility" shall have the meaning set forth in Section 2.1(a).

"Revolving Loans" shall have the meaning set forth in Section 2.1(a).

"Revolving Note" shall have the meaning set forth in Section 2.1(c).

"Security Agreements" means collectively, (i) the Security Agreements dated as of the Effective Date between Borrower and Bank and (ii) any security agreements or assignments of Borrower's intellectual property to the Bank as security for the Obligations.

"Subsidiary" means any Person of which Borrower directly or indirectly owns or controls at the time outstanding stock or other ownership interests having under ordinary circumstances (not depending on the happening of a contingency) voting power to elect a majority of the board of directors or comparable managing body (in the case of any Person which is not a corporation) of such Person.

"Tangible Net Worth" means the total of the capital stock (less treasury stock), paid-in surplus, general contingency reserves and retained earnings (deficit) of Borrower and any Subsidiary as determined on a consolidated basis in accordance with GAAP, after eliminating all inter-company items and all amounts properly attributable to minority interests, if any, in the stock and surplus of any Subsidiary, minus the following items (without duplication of deductions) if any, appearing on the consolidated balance sheet of Borrower:

    (i)     all deferred charges (less amortization, unamortized debt discount and expense and corporate organization expenses);

    (ii)    the book amount of all assets which would be treated as intangibles under GAAP, including, without limitation, such items as good-will, trademark applications, trade names, service marks, brand names, copyrights, patents, patent applications and licenses, and rights with respect to the foregoing;

    (iii)   the amount by which aggregate inventories or aggregate securities appearing on the asset side of such consolidated balance sheet exceed the lower of cost or market value (at the date of such balance sheet) thereof;

    (iv)   any subsequent write-up in the book amount of any asset resulting from a revaluation thereof from the book amount entered upon acquisition of such asset;

    (v)    any redemption by Borrower of outstanding stock warrants; and

    (vi)   advances to Affiliates

"Term Note" shall have the meaning set forth in Section 2.2(a).

"Term Loan Commitment" shall have the meaning set forth in Section 2.2(a).

"Term Note Maturity Date" means November 1, 2015.

"Termination Date" means November 1, 2011.

"UCC" means the Uniform Commercial Code as in effect in the State whose law governs perfection of the Bank's security interests in the Collateral.

"Unfunded Capital Expenditures" means capital expenditures made from the Borrower's funds, other than funds borrowed to finance such capital expenditures.

"Unused Availability" means an amount equal to (i) the Maximum Amount minus (ii) the aggregate Revolving Loans outstanding.

070 - MCNB

# FIFTH THIRD BANK

## Revolving Note

OFFICER No. 05641
$1 000 000 00

NOTE No. ▓▓▓▓▓▓▓▓

April 2, 2013
(Effective Date)

1.   PROMISE TO PAY. On or before April 1, 2014 (the "Maturity Date"), the undersigned, Liteflex LLC, an Ohio limited liability company located at 100 Holiday Drive, Englewood Montgomery County, Ohio 45322 and Brandt Manufacturing LLC, an Ohio limited liability company located at 100 Holiday Drive, Englewood, Montgomery County, Ohio 45532 (collectively and jointly and severally,  Borrower") for value received, hereby promises to pay to the order of Fifth Third Bank  an Ohio banking corporation located at 1 South Main Street, Dayton, Montgomery County, Ohio 45402 for itself and as agent for any affiliate of Fifth Third Bancorp (together with its successors and assigns, the "Lender") the sum of One Million and 00/100 Dollars ($1,000,000 00) (the 'Borrowing"), plus interest as provided herein, less such amounts as shall have been repaid in accordance with this Note  The outstanding balance of this Note shall appear on a supplemental bank record and is not necessarily the face amount of this Note  which record shall evidence the balance due pursuant to this Note at any time.

Principal and interest payments shall be made at Lender's address above unless otherwise designated by Lender in writing  Each payment hereunder may be applied in the following order: accrued interest, principal fees, charges and advanced costs

Subject to the terms and conditions hereof and in reliance upon the representations and warranties of Borrower herein, Lender hereby extends to Borrower a line of credit facility pursuant to which Lender, in its reasonable discretion, may make loans hereunder to Borrower  on a revolving basis and upon Borrower's request from time to time during the term of this Note (each, a "Revolving Loan"), provided that: (a) the aggregate principal amount borrowed hereunder at any time shall not exceed the lesser of (i) the Borrowing  or (ii) the Borrowing Base (as defined below) and (b) no Event of Default shall exist or be caused thereby  Lender may create and maintain reserves from time to time based on such credit and collateral considerations as Lender may deem appropriate. Borrower may borrow  prepay  in whole or in part, and reborrow hereunder; provided that, in the event that the principal amount of all Revolving Loans outstanding at any one time under this Note shall exceed the foregoing limits, Borrower shall immediately repay the amount of such excess to Lender in cash  In the event Borrower fails to pay such excess. Lender may  in its discretion  setoff such amount against Borrower's accounts at Lender

Borrower may request a Revolving Loan by written notice to Lender, via facsimile transmission  electronic mail or otherwise  no later than 10:00 a.m. local time on the date Borrower shall request that such Revolving Loan be advanced, which written request shall include a Borrowing Base Certificate certified by the Borrower or financial officer of Borrower that sets forth the calculation of the Borrowing Base as of such date if requested or required by Lender  Lender shall make each Revolving Loan by crediting the amount thereof to Borrower's account at Lender

The entire principal balance, together with all accrued and unpaid interest and any other charges, advances and fees, if any  outstanding hereunder  shall be due and payable in full on the earlier of the Maturity Date or upon acceleration of the Note.

The principal sum outstanding shall bear interest at a floating rate per annum equal to 3 75% in excess of the "LIBOR Rate", (the "Interest Rate")  The LIBOR Rate is the rate of interest (rounded upwards, if necessary  to the next 1/8 of 1% and adjusted for reserves if Lender is required to maintain reserves with respect to relevant advances) fixed by the British Bankers' Association at 11:00 a.m.  London time, relating to quotations for the one month London InterBank Offered Rates on U.S. Dollar deposits as published on Bloomberg LP, or  if no longer provided by Bloomberg LP, such rate as shall be determined in good faith by the Lender from such sources as it shall determine to be comparable to Bloomberg LP (or any successor)  as determined by Lender at approximately  10:00 a.m. Cincinnati, Ohio time  on the relevant date of determination  The Interest Rate shall initially be determined as of the date of the initial advance of funds to Borrower under this Note and shall be effective until the first business day of the month following the one month period after the initial

EXHIBIT
B
ALL-STATE LEGAL®

advance The Interest Rate shall be adjusted automatically on the first business day each one month thereafter commencing on the first business day of the month following the expiration of the initial Interest Rate determination under this Note. Interest shall be calculated based on a 360-day year and charged for the actual number of days elapsed and shall be payable on the 1st day of each calendar month beginning on May 1 2013

In addition, notwithstanding anything herein contained to the contrary if prior to or during any period with respect to the LIBOR Rate any change in any law, regulation or official directive, or in the interpretation thereof, by any governmental body charged with the administration thereof shall make it unlawful for Lender to fund or maintain its funding in Eurodollars of any portion of the advance subject to the LIBOR Rate or otherwise to give effect to Lender's obligations as contemplated hereby: (i) Lender may by written notice to Borrower, declare Lender's obligations in respect of the LIBOR Rate to be terminated forthwith and (ii) the LIBOR Rate with respect to Lender shall forthwith cease to be in effect, and interest shall from and after such date be calculated at the Prime Rate, and interest shall be paid on the first (1st) day of each calendar month Borrower hereby agrees to reimburse and indemnify Lender from all increased costs or fees incurred by Lender subsequent to the date hereof relating to the offering of rates of interest based upon the LIBOR Rate. Borrower's right utilize LIBOR Rate Index Pricing as set forth in this Note shall be terminated automatically if Lender, by telephonic notice shall notify Borrower that one two three, four or six month Libor Rates are not readily available in the London Inter-Bank Offered Rate Market or that by reason of circumstances affecting such Market adequate and reasonable methods do not exist for ascertaining the rate of interest applicable to such deposits In such event amounts outstanding hereunder shall bear interest at a rate equal to Lender's Prime Rate or such other rate of interest as may be agreed to between Lender and Borrower

Notwithstanding any provision to the contrary in this Note, in no event shall the interest rate charged on the Borrowing exceed the maximum rate of interest permitted under applicable state and/or federal usury law Any payment of interest that would be deemed unlawful under applicable law for any reason shall be deemed received on account of, and will automatically be applied to reduce the principal sum outstanding and any other sums (other than interest) due and payable to Lender under this Note, and the provisions hereof shall be deemed amended to provide for the highest rate of interest permitted under applicable law

    2.     <u>USE OF PROCEEDS.</u> Borrower certifies that the proceeds of this loan are to be used for business purposes.

    3     <u>RENEWAL.</u> This Note is issued not as a payment toward, but as a continuation of the obligations of Borrower to Lender pursuant to that certain note dated November 2, 2012 in the principal amount of $1 000 000 00 (together with all prior amendments thereto or restatements thereof the Prior Note") Accordingly this Note shall not be construed as a novation or extinguishment of, the obligations arising under the Prior Note and its issuance shall not affect the priority of any security interest granted in connection with the Prior Note

    4     <u>REPRESENTATIONS AND WARRANTIES.</u> Borrower hereby warrants and represents to Lender the following:

    (a)     <u>Organization and Qualification.</u> Borrower is duly organized, validly existing and in good standing under the laws of the State of its organization, has the power and authority to carry on its business and to enter into and perform all documents relating to this loan transaction and is qualified and licensed to do business in each jurisdiction in which such qualification or licensing is required All information provided to Lender with respect to Borrower and its operations is true and correct

    (b)     <u>Due Authorization.</u> The execution, delivery and performance by Borrower of the Loan Documents have been duly authorized by all necessary company action and shall not contravene any law or any governmental rule or order binding on Borrower or the articles of organization and operating agreement of Borrower nor violate any agreement or instrument by which Borrower is bound nor result in the creation of a Lien on any assets of Borrower except the Lien granted to Lender herein. Borrower has duly executed and delivered to Lender the Loan Documents and they are valid and binding obligations of Borrower enforceable according to their respective terms, except as limited by equitable principles and by bankruptcy insolvency or similar laws affecting the rights of creditors generally No notice to or consent by, any governmental body is needed in connection with this transaction



(c)     Litigation.   There are no suits or proceedings pending or threatened against or affecting Borrower. and no proceedings before any governmental body are pending or threatened against Borrower except as otherwise specifically disclosed to Lender on or prior to the Effective Date or as set forth on any Litigation Exhibit which may be attached hereto

(d)     Business.  Borrower is not a party to or subject to any agreement or restriction that may have a material adverse effect on Borrower's business properties or prospects.    Borrower has all franchises authorizations patents trademarks, copyrights and other rights necessary to advantageously conduct its business  They are all in full force and effect and are not in known conflict with the rights of others.

(e)     Licenses, etc.  Borrower has obtained any and all licenses permits, franchises, governmental authorizations patents trademarks, copyrights or other rights necessary for the ownership of its properties and the advantageous conduct of its business  Borrower possesses adequate licenses, patents  patent applications copyrights, trademarks trademark applications  and trade names to continue to conduct its business as heretofore conducted by it  without any conflict with the rights of any other person or entity    All of the foregoing are in full force and effect and none of the foregoing are in known conflict with the rights of others

(f)     Laws.  Borrower is in material compliance with all laws, regulations, rulings orders, injunctions decrees, conditions or other requirements applicable to or imposed upon Borrower by any law or by any governmental authority court or agency

(g)     Title.  Borrower has good and marketable title to the assets reflected on the most recent balance sheet submitted to Lender  free and clear from all liens and encumbrances of any kind, except for (collectively  the "Permitted Liens") (a) current taxes and assessments not yet due and payable  (b) liens and encumbrances  if any, reflected or noted on such balance sheet or notes thereto, (c) assets disposed of in the ordinary course of business  and (d) any security interests  pledges  assignments or mortgages granted to Lender to secure the repayment or performance of the Obligations

(h)     Subsidiaries and Partnerships.    Borrower has no subsidiaries and is not a party to any partnership agreement or joint venture agreement

5      AFFIRMATIVE COVENANTS.   Borrower covenants with  and represents and warrants to  Lender that, from and after the execution date of the Loan Documents until the Obligations are paid and satisfied in full:

(a)     Access to Business Information.  Borrower shall maintain proper books of accounts and records and enter therein complete and accurate entries and records of all of its transactions in accordance with reasonable cash accounting methods consistently applied in accordance with past practices and give representatives of Lender access thereto at all reasonable times  including permission to: (a) examine  copy and make abstracts from any such books and records and such other information which might be helpful to  Lender in evaluating the status of the Obligations as it may reasonably request from time to time  and (b) communicate directly with any of Borrower's officers  employees  agents  accountants or other financial advisors with respect to the business  financial conditions and other affairs of the Borrower.

(b)     Inspection of Collateral.  Borrower shall give Lender reasonable access to the Collateral and the other property securing the Obligations for the purpose of performing examinations thereof and to  verify its condition or existence

(c)     Financial Statements.  Borrower shall maintain a standard and modern system for accounting and shall furnish to Lender:

(i)      Within 30 days after the end of each month  a copy of Borrower's internally prepared consolidated financial statements for that month and for the year to date in a form reasonably acceptable to Lender  prepared and certified as complete and correct, subject to changes resulting from year-end adjustments  by the principal financial officer of Borrower;



(ii)      Within 120 days after the end of each fiscal year, a copy of Borrower's internally prepared consolidated financial statements for that year in a form reasonably acceptable to Lender, prepared and certified as complete and correct  subject to changes resulting from year-end adjustments by the principal financial officer of Borrower;

(iii)     Within 120 days after the end of each fiscal year, a copy of Borrower's financial statements reviewed by a firm of independent certified public accountants acceptable to Lender (which acceptance shall not be unreasonably withheld) and accompanied by a review verification of such accountants without qualification;

(iv)     With the statements submitted above  a certificate signed by the  Borrower  (i) stating that no Event of Default specified  herein  nor any event which upon notice or lapse of time  or both would constitute such an Event of Default,  has occurred, or if any such condition or event existed or exists, specifying it and describing what action  Borrower has taken or proposes to take with respect thereto, and (ii) setting forth  in summary form  figures showing the financial status of  Borrower in respect of the financial restrictions contained  herein;

(v)      Immediately upon any officer of Borrower obtaining knowledge of any condition or event which constitutes or,  after notice or lapse of time or both  would constitute an Event of Default, a certificate of such person specifying the nature and period of the existence thereof  and what action Borrower has taken or is taking or proposes to take in respect thereof;

All of the statements referred to in (i) and (ii) above shall be in conformance with reasonable cash accounting methods consistently applied in accordance with past practices and give representatives of Lender access thereto at all reasonable times, including permission to examine  copy and make abstracts from any such books and records and such other information which might be helpful to Lender in evaluating the status of the loans as it may reasonably request from time to time

On the execution date hereof and within 20 days after the end of each calendar month, Borrower shall deliver to Lender a Borrowing Base Certificate in the form regularly used by Lender's commercial loan customers.

With all financial statements delivered to Lender as provided in (i) and (ii) above, Borrower shall deliver to Lender a Financial Statement Compliance Certificate in addition to the other information set forth therein, which certifies the Borrower's compliance with the financial covenants set forth herein and that no Event of Default has occurred

If at any time Borrower has any additional subsidiaries which have financial statements that could be consolidated with those of Borrower under generally accepted accounting principles  the financial statements required by subsections (i) and (ii) above shall be the financial statements of Borrower and all such subsidiaries prepared on a consolidated and consolidating basis

(d)      Condition and Repair.  Borrower shall maintain its equipment and all Collateral used in the operation of its business in good repair and working order and shall make all appropriate repairs, improvements and replacements thereof so that the business carried on in connection therewith may be properly and advantageously conducted at all times

(e)      Insurance.  At its own cost, Borrower shall obtain and maintain insurance against (a) loss, destruction or damage to its properties and business of the kinds and in the amounts customarily insured against by corporations with established reputations engaged in the same or similar business as Borrower and  in any event  sufficient to fully protect Lender's interest in the Collateral, and (b) insurance against public liability and third party property damage of the kinds and in the amounts customarily insured against by corporations with established reputations engaged in the same or similar business as Borrower. All such policies shall (i) be issued by financially sound and reputable insurers, (ii) name Lender as an additional insured and  where applicable, as loss payee under a Lender loss payable endorsement satisfactory to Lender, and (iii) shall provide for thirty (30) days written notice to Lender before such policy is altered or canceled.  All of the insurance policies required hereby shall be evidenced by one or more Certificates of Insurance delivered to Lender by Borrower on the Closing Date and at such other times as Lender may request from time to time



(f)     Taxes.  Borrower shall pay when due all taxes, assessments and other governmental charges imposed upon it or its assets franchises business income or profits before any penalty or interest accrues thereon (provided however, that extensions for filing and payment of such taxes shall be permitted hereunder if disclosed to and consented to by Lender) and all claims (including without limitation claims for labor services materials and supplies) for sums which by law might be a lien or charge upon any of its assets provided that (unless any material item or property would be lost forfeited or materially damaged as a result thereof) no such charge or claim need be paid if it is being diligently contested in good faith, if Lender is notified in advance of such contest and if Borrower establishes an adequate reserve or other appropriate provision required by generally accepted accounting principles and deposits with Lender cash or bond in an amount acceptable to Lender

(g)     Existence; Business.  Borrower shall (a) maintain its existence as a limited liability company, (b) continue to engage primarily in business of the same general character as that now conducted, and (c) refrain from entering into any lines of business substantially different from the business or activities in which Borrower is presently engaged

(h)     Compliance with Laws.  Borrower shall comply with all federal, state and local laws regulations and orders applicable to Borrower or its assets including but not limited to all Environmental Laws in all respects material to Borrower's business assets or prospects and shall immediately notify Lender of any violation of any rule, regulation statute ordinance, order or law relating to the public health or the environment and of any complaint or notifications received by Borrower regarding to any environmental or safety and health rule regulation statute ordinance or law  Borrower shall obtain and maintain any and all licenses, permits franchises governmental authorizations, patents trademarks, copyrights or other rights necessary for the ownership of its properties and the advantageous conduct of its business and as may be required from time to time by applicable law.

(i)     Notice of Default.  Borrower shall within ten (10) days of its knowledge thereof give written notice to Lender of: (a) the occurrence of any event or the existence of any condition which would be, after notice or lapse of applicable grace periods, an Event of Default and (b) the occurrence of any event or the existence of any condition which would prohibit or limit the ability of Borrower to reaffirm any of the representations or warranties, or to perform any of the covenants, set forth herein.

(j)     Costs.  Borrower shall reimburse Lender for any and all fees costs and expenses including without limitation, reasonable attorneys fees other professionals fees appraisal fees, environmental assessment fees (including Phase I and Phase II assessments) field exam audits expert fees, court costs litigation and other expenses (collectively the "Costs") incurred or paid by Lender or any of its officers employees or agents in connection with: (a) the preparation negotiation procurement review, administration or enforcement of the Loan Documents or any instrument, agreement document policy consent, waiver subordination release of lien, termination statement satisfaction of mortgage, financing statement or other lien search, recording or filing related thereto (or any amendment, modification or extension to, or any replacement or substitution for, any of the foregoing), whether or not any particular portion of the transactions contemplated during such negotiations is ultimately consummated and (b) the defense preservation and protection of Lender's rights and remedies thereunder including without limitation, its security interest in the Collateral or any other property pledged to secure the Loans, whether incurred in bankruptcy insolvency foreclosure or other litigation or proceedings or otherwise.  The Costs shall be due and payable upon demand by Lender  If Borrower fails to pay the Costs when upon such demand Lender is entitled to disburse such sums as Obligations  Thereafter the Costs shall bear interest from the date incurred or disbursed at the highest rate set forth in the Note(s)  This provision shall survive the termination of this Agreement and/or the repayment of any amounts due or the performance of any Obligation.

(k)     Other Amounts Deemed Loans.  If Borrower fails to pay any tax, assessment governmental charge or levy or to maintain insurance within the time permitted or required by this Note, or to discharge any Lien prohibited hereby, or to comply with any other Obligation  Lender may  but shall not be obligated to  pay, satisfy, discharge or bond the same for the account of Borrower  To the extent permitted by law and at the option of Lender all monies so paid by Lender on behalf of Borrower shall be deemed Obligations and Borrower's payments under this Note may be increased to provide for payment of such Obligations plus interest thereon



(l)     _Further Assurances._  Borrower shall execute acknowledge and deliver or cause to be executed, acknowledged or delivered, any and all such further assurances and other agreements or instruments, and take or cause to be taken all such other action  as shall be reasonably necessary from time to time to give full effect to the Loan Documents and the transactions contemplated thereby

6      NEGATIVE COVENANTS.  Borrower covenants with, and represents and warrants to, Lender that  from and after the execution date hereof until the Obligations are paid and satisfied in full:

(a)     _Merger; Disposition of Assets._  Borrower shall not (a) change its capital structure (b) merge or consolidate with any entity (c) amend or change its articles of organization and operating agreement or (d) sell lease, transfer or otherwise dispose of or grant any person an option to acquire, or sell and leaseback, all or any substantial portion of its assets  whether now owned or hereafter acquired, except for bona fide sales of Inventory in the ordinary course of business and dispositions of property which is obsolete and not used or useful in its business

7      FINANCIAL COVENANTS  Borrower and Lender hereby agrees as follows:

(a)     _Minimum Tangible Net Worth._     Borrower and Co-Borrower shall not permit its Tangible Net Worth  on a consolidated basis  to be less than the following at the end of any quarter during any of the periods set forth below:

| Period | Min. Amount |
|---|---|
| 12/31/2012 and thereafter | $3 500,000 00 |

(b)     _Fixed Charge Coverage Ratio._     Borrower and Co-Borrower shall not permit its Fixed Charge Coverage Ratio, on a consolidated basis  excluding distributions for payments on the B4C loan, to be less than the following at the end of any quarter during any of the following periods as measured on a trailing twelve month basis

| Period | Min. Ratio |
|---|---|
| 09/30/2012 and thereafter | 1 20 to 1 0 |

8      DEFINITIONS.  Certain capitalized terms have the meanings set forth on any exhibit hereto  in the Security Agreement  if applicable  or any other Loan Document  All financial terms used herein but not defined on the exhibits, in the Security Agreement  if applicable  or any other Loan Document  have the meanings given to them by generally accepted accounting principles   All other undefined terms have the meanings given to them in the Uniform Commercial Code as adopted in the state whose law governs this instrument  The following definitions are used herein:

(a)     "Account Debtor"  means Borrower's customers and all other persons obligated to Borrower on Accounts

(b)     "Borrowing Base" means, as of the relevant date of determination, the sum of 80% of the net amount of Borrower's Eligible Accounts, plus 40% of the net amount of Borrower's Eligible Inventory

(c)     "Business Day" means any day other than a Saturday  Sunday  federal holiday or other day on which the New York Stock Exchange is regularly closed

(d)     "EBITDA" means on a consolidated basis  the amount of Borrower's earnings before interest taxes  depreciation and amortization expense for the measurement period

(e)     "Eligible Accounts" means  as of the relevant date of determination, those trade accounts arising in the ordinary course of business that: (i) shall be due and payable within 60 days from the invoice date  (ii) have been validly assigned to Lender, (iii) strictly comply with all of Borrower's warranties and representations to Lender in the Loan Documents  and  (iv) with regard to which Borrower strictly complies with its covenants with Lender in the Loan Documents; provided that Eligible Accounts shall not include the following: (a) Accounts with respect to



which the Account Debtor is a shareholder, officer  employee or agent of Borrower  or a corporation more than 5% of the stock of which is owned by any of such persons; (b) Accounts with respect to which the Account Debtor is not a resident of the United States or Canada; (c) Accounts with respect to which the Account Debtor is the United States or any department, agency or instrumentality of the United States unless Borrower has assigned its interests in such Accounts to Lender pursuant to Federal Assignment of Claims Act or Lender has expressly waived that requirement with respect to specific receivables; (d) Accounts with respect to which the Account Debtor is any State of the United States or any city  town municipality or division thereof that requires Borrower to support its obligations to such Account Debtor with a performance bond issued by a surety company; (e) Accounts with respect to which the Account Debtor is a subsidiary of, related to  affiliated or has common officers or directors with Borrower; (f) any Accounts of a particular Account Debtor if Borrower is or may become liable to that Account Debtor for goods sold or services rendered by that Account Debtor to such Borrower; (g) any Accounts owed by a particular Account Debtor, other than the U S  Government, or a department or agency thereof, which exceed 20% of all Eligible Accounts; (h) any and all Accounts owed by a particular Account Debtor when 25% or more of the total Accounts of such Account Debtor are more than 60 days old from the invoice date; (i) any Accounts owed by an Account Debtor who does not meet Lender's standards of creditworthiness  in Lender's sole credit judgment exercised in good faith; (j) any Accounts owed by any Account Debtor which has filed or has had filed against it a petition for bankruptcy  insolvency  reorganization or any other type of relief under insolvency laws; (k) any Accounts owed by an Account Debtor which has made an assignment for the benefit of creditors; and (l) any Accounts deemed to be ineligible by Lender based upon credit and collateral considerations as Lender may deem appropriate  in Lender's sole judgment exercised in good faith

(f)      Eligible Inventory ' means, as of the relevant date of determination  Borrower's Inventory of raw materials  work-in-process and/or finished goods  valued at the lower of cost or fair market value on a first in, first out basis, in accordance with generally accepted accounting principles consistently applied  and excluding (a) obsolete or unsalable items, (b) any Inventory in which Lender does not have a valid  first priority and fully perfected security interest  (c) Inventory located outside the United States  (d) any Inventory not in the actual possession of Borrower or located at any leased location or public warehouse  (e) any Inventory subject to a Lien (except for Permitted Liens)  or subject to a claim of title by a government authority under 32 C F R  Section 7-104 35(b)/FAR 52 232 16, and (f)  any other Inventory deemed ineligible by Lender, in its sole discretion, based on such credit and collateral considerations as Lender may deem appropriate  Inventory which is deemed to be Eligible Inventory  but which subsequently fails to meet the foregoing criteria for Eligible Inventory, shall immediately cease to be Eligible Inventory for the purpose of determining the Borrowing Base

(g)      'FIFO (first-in  first-out)" shall mean an inventory cost flow whereby the first goods are assumed to be the first goods sold so that the ending inventory consists of the most recently purchased goods

(h)      Fixed Charge Coverage Ratio" means the ratio of (a) Borrower's and Co-Borrower's EBITDA plus rent and operating lease payments  less cash taxes paid, distributions, dividends and capital expenditures (other than capital expenditures financed with the proceeds of purchase money Indebtedness or capital leases to the extent permitted hereunder) and other extraordinary items for the twelve month period then ending to (b) the consolidated sum of (i) Borrower's and Co-Borrower's interest expense, and (ii) all principal payments with respect to Indebtedness that were paid or were due and payable by all consolidated entities during the period plus rent and operating lease expense incurred in the same such period

(i)      "Indebtedness ' means (i) all items (except items of capital stock, of capital surplus  of general contingency reserves or of retained earnings  deferred income taxes  and amount attributable to minority interest if any) which in accordance with generally accepted accounting principles would be included in determining total liabilities on a consolidated basis (if  Borrower should have a subsidiary) as shown on the liability side of a balance sheet as at the date as of which Indebtedness is to be determined  (ii) all indebtedness secured by any mortgage  pledge  lien or conditional sale or other title retention agreement to which any property or asset owned or held is subject  whether or not the indebtedness secured thereby shall have been assumed (excluding non-capitalized leases which may amount to title retention agreements but including capitalized leases)  and (iii) all indebtedness of others which Borrower or any subsidiary has directly or indirectly  guaranteed  endorse (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently



or otherwise) to purchase or repurchase or otherwise acquire or in respect of which Borrower or any subsidiary has agreed to apply or advance funds (whether by way of loan stock purchase capital contribution or otherwise) or otherwise to become directly or indirectly liable

(j)     "Lien" means any security interest mortgage pledge, assignment lien or other encumbrance of any kind including interests of vendors or lessors under conditional sale contracts or capital leases

(k)     "LIFO (last-in first-out)" shall mean an inventory cost flow whereby the last goods purchased are assumed to be the first goods sold so that the ending inventory consists of the first goods purchased

(l)     "LIFO Reserve' shall mean the difference between the ending inventory under LIFO and FIFO

(m)     'Loan Documents" means any and all Rate Management Agreements and each and every document or agreement executed by any party evidencing guarantying or securing any of the Obligations; and "Loan Document" means any one of the Loan Documents

(n)     Obligation(s) means all loans advances indebtedness and each and every other obligation or liability of Borrower owed to each of Lender and/or any affiliate of Fifth Third Bancorp however created, of every kind and description whether now existing or hereafter arising and whether direct or indirect primary or as guarantor or surety absolute or contingent liquidated or unliquidated matured or unmatured participated in whole or in part created by trust agreement lease overdraft agreement or otherwise whether or not secured by additional collateral, whether originated with Lender or owed to others and acquired by Lender by purchase assignment or otherwise and including without limitation, all loans, advances indebtedness and each and every obligation or liability arising under the loan document any and all Rate Management Obligations (as defined in the Loan Documents), letters of credit now or hereafter issued by Lender or any affiliate of Fifth Third Bancorp for the benefit of or at the request of Borrower, all obligations to perform or forbear from performing acts, and agreements instruments and documents evidencing guarantying securing or otherwise executed in connection with any of the foregoing, together with any amendments, modifications and restatements thereof, and all expenses and attorneys' fees incurred by Lender hereunder or any other document instrument or agreement related to any of the foregoing

(o)     Subsidiary' means any corporation of which Borrower directly or indirectly owns or controls at the time outstanding stock having ordinary circumstances (not depending on the happening of a contingency) voting power to elect a majority of the board of directors of said corporation

(p)     "Tangible Net Worth shall mean the total of the capital stock (less treasury stock) paid-in capital surplus general contingency reserves and retained earnings (deficit) of Borrower and Co-Borrower and any Subsidiary as determined on a consolidated basis in accordance with generally accepted accounting principles after eliminating all inter-company items and all amounts properly attributable to minority interests, if any in the stock and surplus of any Subsidiary minus the following items (without duplication of deductions) if any appearing on the consolidated balance sheet of Borrower and Co-Borrower:

(i)     all deferred charges (less amortization unamortized debt discount and expense and corporate organization expenses);

(ii)     the book amount of all assets which would be treated as intangibles under generally accepted accounting principles including, without limitation such items as goodwill, trademark applications trade names service marks, brand names, copyrights patents patent applications and licenses and rights with respect to the foregoing;

(iii)     the amount by which aggregate inventories or aggregate securities appearing on the asset side of such consolidated balance sheet exceed the lower of cost or market value (at the date of such balance sheet) thereof;



(iv)     any write-up in the book amount of any asset resulting from a revaluation thereof from the book amount entered upon acquisition of such asset; and

(v)     Any related party notes or accounts receivable. Related parties shall generally include entities with common ownership or management with the Borrower and Co-Borrower and employees of the Borrower and Co-Borrower

(q)     "Collateral" means all personal and/or real property provided by Borrower to Lender as collateral security for the obligations.

(r)     Rate Management Agreement" means any agreement device or arrangement providing for payments which are related to fluctuations of interest rates exchange rates, forward rates or equity prices, including but not limited to, dollar-denominated or cross-currency interest rate exchange agreements forward currency exchange agreements, interest rate cap or collar protection agreements forward rate currency or interest rate options puts and warrants, and any agreement pertaining to equity derivative transactions (e g , equity or equity index swaps, options, caps, floors collars and forwards), including without limitation any ISDA Master Agreement between Borrower and Lender or any affiliate of Fifth Third Bancorp and any schedules confirmations and documents and other confirming evidence between the parties confirming transactions thereunder all whether now existing or hereafter arising, and in each case as amended, modified or supplemented from time to time.

(s)     "Rate Management Obligations" means any and all obligations of Borrower to Lender or any affiliate of Fifth Third Bancorp whether absolute. contingent or otherwise and howsoever and whensoever (whether now or hereafter) created arising evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefore) under or in connection with (i) any and all Rate Management Agreements, and (ii) any and all cancellations buy backs reversals. terminations or assignments of any Rate Management Agreement

9.     EVENTS OF DEFAULT. Upon the occurrence of any of the following events (each, an Event of Default"), Lender may at its option without any demand or notice whatsoever, cease making advances and declare this Note and all Obligations to be fully due and payable in their aggregate amount, together with accrued interest and all prepayment premiums fees and charges applicable thereto:

(a)     Any failure to make any payment when due of principal or accrued interest on this Note or any other Obligation and such nonpayment remains uncured for 10 days after written notice from Lender to Borrower of such default

(b)     Any representation or warranty of Borrower set forth in this Note or in any agreement, instrument document certificate or financial statement evidencing, guarantying securing or otherwise related to this Note or any other Obligation shall be materially inaccurate or misleading

(c)     Borrower or any Guarantor shall fail to observe or perform any other term or condition of this Note or any other term or condition set forth in any agreement. instrument document certificate or financial statement evidencing guarantying or otherwise related to this Note or any other Obligation or Borrower or any Guarantor shall otherwise default in the observance or performance of any covenant or agreement set forth in any of the foregoing for 30 days after written notice from Lender to Borrower of such default.

(d)     The dissolution of Borrower or of any endorser or guarantor of the Obligations or the merger or consolidation of any of the foregoing with a third party, or the lease sale or other conveyance of a material part of the assets or business of any of the foregoing to a third party outside the ordinary course of its business, or the lease purchase or other acquisition of a material part of the assets or business of a third party by any of the foregoing.

(e)     The creation of any Lien (except a lien to Lender) on, the institution of any garnishment proceedings by attachment, levy or otherwise against the entry of a judgment against, or the seizure of any of the property of Borrower or any endorser or guarantor hereof including without limitation any property deposited with Lender



(f)      In the reasonable judgment of Lender in good faith  any material adverse change occurs in the existing  or prospective financial condition of Borrower that may affect the ability of Borrower to repay the Obligations  or the Lender deems itself insecure

(g)      A commencement by the Borrower of a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or the entry of a decree or order for relief in respect of the Borrower in a case under any such law or appointing a receiver  liquidator, assignee  custodian  trustee  sequestrator (or other similar official) of the Borrower, or for any substantial part of the property of Borrower  or ordering the wind-up or liquidation of the affairs of Borrower; or the filing and pendency for 30 days without dismissal of a petition initiating an involuntary case under any such bankruptcy, insolvency or similar law; or the making by Borrower of any general assignment for the benefit of creditors; or the failure of the Borrower of the Obligations generally to pay its debts as such debts become due; or the taking of action by the Borrower in furtherance of any of the foregoing

(h)      Nonpayment by the Borrower of any Rate Management Obligation relating to this Note when due  or the breach by the Borrower of any term  provision or condition contained in any Rate Management Agreement

10      REMEDIES.  After the occurrence of an Event of Default  in addition to any other remedy permitted by law  Lender may at any time  without notice  apply the Collateral to this Note or such other Obligations  whether due or not  and Lender may, at its option, proceed to enforce and protect its rights by an action at law or in equity or by any other appropriate proceedings; provided that this Note and the Obligations shall be accelerated automatically and immediately if the Event of Default is a filing under the Bankruptcy Code

Lender's rights and remedies hereunder are cumulative  and may be exercised together, separately, and in any order   No delay on the part of Lender in the exercise of any such right or remedy shall operate as a waiver.  No single or partial exercise by Lender of any right or remedy shall preclude any other further exercise of it or the exercise of any other right or remedy.  No waiver or indulgence by Lender of any Event of Default shall be effective unless in writing and signed by Lender  nor shall a waiver on one occasion be construed as a waiver of any other occurrence in the future.

11.      LATE PAYMENTS; DEFAULT RATE; FEES.  If any payment is not paid when due (whether by acceleration  or otherwise) or within 10 days thereafter  undersigned agrees to pay to Lender a late payment fee as provided for in any loan agreement or 5% of the payment amount  whichever is greater  with a minimum fee of $20.00  After an Event of Default  Borrower agrees to pay to Lender a fixed charge of $25.00  or Borrower agrees that Lender may  without notice  increase the Interest Rate by three percentage points (3%) (the "Default Rate"), whichever is greater  Lender may impose a non-sufficient funds fee for any check that is presented for payment that is returned for any reason  In addition  Lender may charge loan documentation fees as may be reasonably determined by the Lender.

12.      ROUNDING AND RATE MANAGEMENT AGREEMENT.  Any time during which a Rate Management Agreement is then in effect with respect to this Note  the provisions contained in this Note which round up the interest rate to the nearest 1/8 shall be disregarded and no longer of any force and effect, notwithstanding anything to the contrary contained in this Note.  These "round up" provisions appear as a parenthetical as follows: (rounded upwards  if necessary  to the next 1/8 of 1%)

13      MULTIPLE OBLIGORS.

(a)      Each and every reference to and any and all representations, warranties  covenants and undertakings of Borrower herein  including but not limited to the Events of Default, shall be deemed to apply to each of the undersigned jointly and separately

(b)      The obligations and liabilities of each of the undersigned Borrower under  and all representations  warranties and covenants in  this Note and the Loan Documents shall be direct and primary and  joint and several in all respects whatsoever



(c)      Lender may deal with any undersigned Borrower as if it were the sole obligor without impairing in any way the liability of any other obligor  Without limiting the generality of that right  Lender may in particular release  impair, or fail to perfect an interest in any collateral of any undersigned Borrower  waive defaults by any of them  or extend or compromise the liability of any of them without the consent of the other undersigned obligors

(d)      Each of the undersigned Borrower represents that it has carefully considered the alternatives to and the legal consequences of incurring joint and several liability under this Note and has determined that by such arrangement it is able to obtain financing on terms more favorable than otherwise, and that under a joint and several facility each will realize substantial interest savings over alternative financing arrangements

(e)      Each of the undersigned Borrower hereby irrevocably appoints Liteflex LLC (the 'Agent') as its agent representative to deal with the Lender on its behalf in all respects in connection with this Note and the transactions contemplated herein   Each of the undersigned Borrower agrees to be bound by all actions of the Agent in all such respects.

(f)      Lender may bring a separate action or actions under this Note against each or any of the undersigned Borrower  whether such action is brought against any other Borrower, or any other Borrower is not joined therein   Each of the undersigned Borrower agrees that any release which may be given to any other Borrower shall not release any other Borrower from its obligations hereunder  Each of the undersigned Borrower hereby waives any right to assert against Lender any defense (legal or equitable), set off, counterclaim, or claims which any of them individually may now or any time hereafter have against any other Borrower

(g)      Any and all present and future debt and other obligations of any of the undersigned Borrower to another Borrower is hereby subordinated to the full payment and performance of all amounts due to Lender whether under this agreement or otherwise

(h)      Each of the undersigned Borrower is presently informed as to the financial condition of the other Borrowers and all other circumstances of each other relating to this Note and the Loan Documents which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the amounts due hereunder  Each of the undersigned Borrower hereby covenants that it will continue to keep itself informed as to the financial condition of the other Borrowers  the status of the other Borrowers, and all circumstances which bear upon the risk of nonpayment  Absent a written request from any of the undersigned Borrower to Lender for information, each of the undersigned Borrower hereby waives any and all rights it may have to require Lender to disclose to such Borrower any information which Lender may now or hereafter acquire concerning the condition or circumstances of the other Borrowers

(i)      Each of the undersigned Borrower waives all rights to notices of default  existence  creation, or incurring of new or additional indebtedness, and all other notices of formalities to which each such Borrower  may as joint and several Borrower  hereunder be entitled

(j)      The liability of any of the undersigned Borrower hereunder shall survive  discharge  or compromise of any Obligation of any other Borrower in bankruptcy or otherwise.

(k)      Each of the undersigned Borrower hereby waives all defenses, counterclaims and off-sets of any kind or nature  whether legal or equitable, that may arise: (i) directly or indirectly from the present or future lack of validity, binding effect or enforceability of this Note, any Loan Documents or any other document or instrument evidencing, securing or otherwise relating to the Obligations, (ii) from Lender's impairment of any collateral including the failure to record or perfect the Lender's interest in any collateral  or (iii) by reason of any claim or defense based upon an election of remedies by Lender in the event such election may  in any manner  impair  affect, reduce, release  destroy or extinguish any right of contribution or reimbursement of any Borrower or any other rights of any undersigned Borrower to proceed against any other Borrower  guarantor  or against any other person or any collateral.

14      ENTIRE AGREEMENT.  Borrower agrees that there are no conditions or understandings which are not expressed in this Note and the documents referred to herein.



15      SEVERABILITY.  The declaration of invalidity of any provision of this Note shall not affect any part of the remainder of the provisions

16      ASSIGNMENT.  Borrower agrees not to assign any of Borrower's rights  remedies or obligations described in this Note without the prior written consent of Lender.  Borrower agrees that Lender may assign some or all of its rights and remedies described in this Note without notice to  or prior consent from  the Borrower

17      MODIFICATION; WAIVER OF LENDER  The modification or waiver of any of Borrower's obligations or Lender's rights under this Note must be contained in a writing signed by Lender   Lender may perform Borrower's obligations  or delay or fail to exercise any of its rights or remedies, without causing a waiver of those obligations or rights  A waiver on one occasion shall not constitute a waiver on another occasion  Borrower's obligations under this Note shall not be affected if Lender amends  compromises  exchanges  fails to exercise  impairs or releases (i) any of the obligations belonging to any co- borrower, endorser or guarantor or (ii) any of its rights against any co- borrower  guarantor or endorser.

18      WAIVER OF BORROWER.  Demand  presentment  protest and notice of dishonor  notice of protest and notice of default are hereby waived by Borrower  and any endorser or guarantor hereof   Each of Borrower, including but not limited to all co-makers and accommodation makers of this Note, hereby waives all suretyship defenses including but not limited to all defenses based upon impairment of Collateral and all suretyship defenses described in Section 3-605 of the Uniform Commercial Code (the "UCC")   Such waiver is entered to the full extent permitted by Section 3-605 (i) of the UCC

19      GOVERNING LAW; CONSENT TO JURISDICTION   This Note is delivered in  is intended to be performed in  will be governed  construed  and enforceable in accordance with and governed by the internal laws of  the State of Ohio  without regard to principles of conflicts of law   Borrower agrees that the state and federal courts in the County where the Lender is located shall have exclusive jurisdiction over all matters arising out of this Note, and that service of process in any such proceeding shall be effective if mailed to Borrower at the address set forth herein.

20      **JURY WAIVER.  BORROWER, AND ANY ENDORSER OR GUARANTOR HEREOF, WAIVE THE RIGHT TO A TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

21      WARRANT OF ATTORNEY.  Borrower  jointly and severally  authorizes any attorney of record  to appear for it in any court of record in the State of Ohio, after maturity of this Note  whether by its terms or upon default  acceleration or otherwise, to waive the issuance and service of process  and release all errors  and to confess judgment against them in favor of Lender for the principal sum due herein together with interest, charges, court costs and attorneys fees  Stay of execution and all exemptions are hereby waived   If this Note or any Obligation is referred to an attorney for collection  and the payment is obtained without the entry of a judgment, the obligors shall pay to the holder of such obligations its attorneys' fees  EACH OF BORROWER AND ANY ENDORSER OR ANY GUARANTOR AGREES THAT AN ATTORNEY WHO IS COUNSEL TO LENDER OR ANY OTHER HOLDER OF SUCH OBLIGATION MAY ALSO ACT AS ATTORNEY OF RECORD FOR BORROWER  WHEN TAKING THE ACTIONS DESCRIBED ABOVE IN THIS PARAGRAPH  BORROWER AGREES THAT ANY ATTORNEY TAKING SUCH ACTIONS MAY BE PAID FOR THOSE SERVICES BY LENDER OR HOLDER OF SUCH OBLIGATION  BORROWER, JOINTLY AND SEVERALLY  WAIVES ANY CONFLICT OF INTEREST THAT MAY BE CREATED BECAUSE THE ATTORNEY REPRESENTING THE BORROWER IS BEING PAID BY LENDER OR THE HOLDER OF SUCH OBLIGATION



***WARNING - BY SIGNING THIS PAPER YOU GIVE UP YOUR RIGHT TO NOTICE AND COURT TRIAL.  IF YOU DO NOT PAY ON TIME A COURT JUDGMENT MAY BE TAKEN AGAINST YOU WITHOUT YOUR PRIOR KNOWLEDGE AND THE POWERS OF A COURT CAN BE USED TO COLLECT FROM YOU REGARDLESS OF ANY CLAIMS YOU MAY HAVE AGAINST THE CREDITOR WHETHER FOR RETURNED GOODS, FAULTY GOODS, FAILURE ON HIS PART TO COMPLY WITH THE AGREEMENT, OR ANY OTHER CAUSE.***

BORROWER:

Liteflex LLC,  an Ohio limited liability company

By: _____
(Authorized Signer)

John Prikkel III, Sole Member & Manager
(Print Name and Title)

Brandt Manufacturing LLC,  an Ohio limited liability company

By: _____
(Authorized Signer)

John Prikkel III, Sole Member & Manager
(Print Name and Title)